Nos. 21-2861, 21-2872, 21-2873

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

---

SOUTH BRANCH LLC, et al,
*Plaintiffs-Appellant,*
v.
COMMONWEALTH EDISON COMPANY d/b/a ComEd and EXELON CORPORATION,
*Defendants- Appellees.*

---

STEVEN BROOKS, et al,
*Plaintiffs -Appellant,*
v.
COMMONWEALTH EDISON COMPANY d/b/a ComEd and EXELON CORPORATION,
*Defendants- Appellees.*

---

LAWRENCE H. GRESS, et al,
*Plaintiffs -Appellant,*
v.
COMMONWEALTH EDISON COMPANY d/b/a ComEd and EXELON CORPORATION,
*Defendants- Appellees.*

---

On Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division
Case Nos. 1:20-cv-04980, 1:20-cv-04405, 1:20-cv-04555
District Court Judge Jorge L. Alonso

---

BRIEF OF DEFENDANTS-APPELLEES

---

Matthew E. Price
JENNER & BLOCK LLP
1099 New York Ave. NW Suite 900
Washington, DC 20001
(202) 639-6873
mprice@jenner.com

Terrence J. Truax
Nicole A. Allen
Ali I. Alsarraf
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL  60654-3456
(312) 222-9350
ttruax@jenner.com

*Counsel for Defendants-Appellees*

Save As    Clear Form

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: <u>21-2861 (consol. with 21-2872 and 21-2873)</u>

Short Caption: <u>South Branch LLC, et al v. Commonwealth Edison Company, et al</u>

　　To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

　　The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

> [ ]　　**PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)　　The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

　　Commonwealth Edison Company

　　Exelon Corporation

(2)　　The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

　　Jenner & Block LLP

(3)　　If the party, amicus or intervenor is a corporation:

　　i)　　Identify all its parent corporations, if any; and
　　　　Exelon Corporation is the parent company of Commonwealth Edison Company.
　　　　Exelon Corporation is a publicly held corporation with no parent company.

　　ii)　　list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:
　　　　No publicly held corporation other than Exelon Corporation owns 10% or more of Commonwealth Edison Company's stock.
　　　　No publicly held corporation owns 10% or more of Exelon Corporation's stock.

(4)　　Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

　　N/A

(5)　　Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

　　N/A

Attorney's Signature: <u>/s/ Terrence J. Truax</u>　　　　Date: <u>March 7, 2022</u>

Attorney's Printed Name: <u>Terrence J. Truax</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).　**Yes** [✔]　**No** [ ]

Address: <u>353 N. Clark Street</u>

　　<u>Chicago, IL 60654-3456</u>

Phone Number: <u>(312) 222-9350</u>　　　　Fax Number: <u>(312) 527-0484</u>

E-Mail Address: <u>ttruax@jenner.com</u>

rev. 12/19 AK

Save As    Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: <u>21-2861 (consol. with 21-2872 and 21-2873)</u>

Short Caption: <u>South Branch LLC, et al v. Commonwealth Edison Company, et al</u>

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐          **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
<u>Commonwealth Edison Company</u>

<u>Exelon Corporation</u>

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
<u>Jenner & Block LLP</u>

(3)    If the party, amicus or intervenor is a corporation:

   i)        Identify all its parent corporations, if any; and
          <u>Exelon Corporation is the parent company of Commonwealth Edison Company.</u>
          <u>Exelon Corporation is a publicly held corporation with no parent company.</u>

   ii)       list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:
          <u>No publicly held corporation other than Exelon Corporation owns 10% or more of Commonwealth Edison Company's stock.</u>
          <u>No publicly held corporation owns 10% or more of Exelon Corporation's stock.</u>

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:
<u>N/A</u>

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:
<u>N/A</u>

Attorney's Signature: <u>/s/ Matthew E. Price</u>                    Date: <u>March 7, 2022</u>

Attorney's Printed Name:  <u>Matthew E. Price</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☐    No ☑

Address:  <u>1099 New York Avenue, NW, Suite 900</u>

   <u>Washington, DC 20001-4412</u>

Phone Number: <u>(202) 639-6000</u>                    Fax Number: <u>(202) 639-6066</u>

E-Mail Address: <u>mprice@jenner.com</u>

rev. 12/19 AK

Save As     Clear Form

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: <u>21-2861 (consol. with 21-2872 and 21-2873)</u>

Short Caption: <u>South Branch LLC, et al v. Commonwealth Edison Company, et al</u>

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

        [ ]    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

    <u>Commonwealth Edison Company</u>

    <u>Exelon Corporation</u>

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    <u>Jenner & Block LLP</u>

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and
        <u>Exelon Corporation is the parent company of Commonwealth Edison Company.</u>
        <u>Exelon Corporation is a publicly held corporation with no parent company.</u>

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:
        <u>No publicly held corporation other than Exelon Corporation owns 10% or more of Commonwealth Edison Company's stock.</u>
        <u>No publicly held corporation owns 10% or more of Exelon Corporation's stock.</u>

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    <u>N/A</u>

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    <u>N/A</u>

Attorney's Signature: <u>/s/ Nicole A. Allen</u>    Date: <u>March 7, 2022</u>

Attorney's Printed Name:  <u>Nicole A. Allen</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).  **Yes** [ ]  **No** [✔]

Address:  <u>353 N. Clark Street</u>

    <u>Chicago, IL 60654-3456</u>

Phone Number: <u>(312) 222-9350</u>    Fax Number:  <u>(312) 527-0484</u>

E-Mail Address: <u>nallen@jenner.com</u>

rev. 12/19 AK

Save As    Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: <u>21-2861 (consol. with 21-2872 and 21-2873)</u>

Short Caption: <u>South Branch LLC, et al v. Commonwealth Edison Company, et al</u>

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

    Commonwealth Edison Company

    Exelon Corporation

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    Jenner & Block LLP

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and
        Exelon Corporation is the parent company of Commonwealth Edison Company.
        Exelon Corporation is a publicly held corporation with no parent company.

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:
        No publicly held corporation other than Exelon Corporation owns 10% or more of Commonwealth Edison Company's stock.
        No publicly held corporation owns 10% or more of Exelon Corporation's stock.

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    N/A

Attorney's Signature: <u>/s/ Ali I. Alsarraf</u>    Date: <u>March 7, 2022</u>

Attorney's Printed Name: <u>Ali I. Alsarraf</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).  **Yes** ☐  **No** ☑

Address: <u>353 N. Clark Street</u>

    <u>Chicago, IL 60654-3456</u>

Phone Number: <u>(312) 222-9350</u>    Fax Number: <u>(312) 527-0484</u>

E-Mail Address: <u>aalsarraf@jenner.com</u>

# TABLE OF CONTENTS

TABLE OF AUTHORITIES..................................................................................iii

INTRODUCTION..............................................................................................1

JURISDICTIONAL STATEMENT........................................................................3

QUESTIONS PRESENTED..................................................................................3

STATEMENT OF THE CASE..............................................................................3

    A.  The Energy Infrastructure and Modernization Act............................3

    B.  The Future Energy Jobs Act..............................................................8

    C.  The Deferred Prosecution Agreement and Plaintiffs' Suit................10

    D.  Post-DPA Legislative Action............................................................11

    E.  The District Court's Dismissal........................................................11

SUMMARY OF ARGUMENT.............................................................................14

STANDARD OF REVIEW..................................................................................15

ARGUMENT....................................................................................................16

I.     The District Court Correctly Held That the Separation of Powers
      Prevented Plaintiffs from Stating a Claim..............................................16

    A.  The Court May Not Entertain a Claim of Injury from Unchallenged
        Laws, Based on Allegations of Legislative Improprieties. ................17

    B.  The Court May Not Inquire into the Motives of the Legislators Who
        Passed EIMA and FEJA.................................................................20

    C.  Plaintiffs' Counterarguments Have No Merit...................................23

II.    Plaintiffs' Complaint Failed to Allege a Direct Relationship Between the
      Alleged Wrongful Conduct and Their Alleged Injury. .............................28

    A.  Plaintiffs Failed to Allege Proximate Causation Because Independent,
        Intervening Causes Break the Causal Chain. .................................28

        1.  The Independent Decisions of Scores of Legislators. ...................30

2.   The Independent Actions of the ICC and the IPA. ........................................33

B.  Plaintiffs' Remaining Arguments Have No Merit. ................................34

III.    The Filed Rate Doctrine Compels Dismissal With Prejudice...............................38

A.  The Filed Rate Doctrine Was Properly Before the District Court..................38

B.  The Filed Rate Doctrine Bars the Complaint. ......................................41

C.  Plaintiffs' Contrary Arguments Are Without Merit. .........................................45

CONCLUSION ..................................................................................................49

# TABLE OF AUTHORITIES

CASES

*Active Disposal, Inc. v. City of Darien*, 635 F.3d 883 (7th Cir. 2011) ................................15

*Ameren Illinois Co. v. Illinois Commerce Commission*, 2013 IL App (4th) 121008............................................................................................................................8

*Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451 (2006)........................................28, 35

*Armstrong Surgical Center, Inc. v. Armstrong County Memorial Hospital*, 185 F.3d 154 (3d Cir. 1999)............................................................................................19

*Arsberry v. Illinois*, 244 F.3d 558 (7th Cir. 2001).........................................38, 42, 49

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ....................................................................32

*Bieter Co. v. Blomquist*, 987 F.2d 1319 (8th Cir. 1993)..................................... 26-27

*Blank v. Kirwan*, 703 P.2d 58 (Cal. 1985) ..............................................................22

*Bluefield Waterworks & Improvement Co. v. Public Service Commission of West Virginia*, 262 U.S. 679 (1923).....................................................................6

*Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. 639 (2008)...........................36

*Brnovich v. Democratic National Committee*, 141 S. Ct. 2321 (2021) ...............34

*Chappell v. Robbins*, 73 F.3d 918 (9th Cir. 1996) .......................................20, 21, 27

*City of Columbia v. Omni Outdoor Advertising, Inc.*, 499 U.S. 365 (1991) ...........19, 22, 25

*City of Little Rock v. Town of North Little Rock*, 79 S.W. 785 (Ark. 1904) .....................22

*Coll v. First American Title Insurance Co.*, 642 F.3d 876 (10th Cir. 2011)......................44

*Commonwealth Edison Co. v. Illinois Commerce Commission*, 2014 IL App (1st) 122860..............................................................................................8

*Commonwealth Edison Co. v. Illinois Commerce Commission*, 2014 IL App (1st) 130302..............................................................................................8

*Commonwealth Edison Co. v. Illinois Commerce Commission*, 405 Ill. App. 3d 389 (2d Dist. 2010) ..............................................................................4

*Continental Insurance Co. v. M/V ORSULA*, 354 F.3d 603 (7th Cir. 2003)....................38

*County of Stanislaus v. Pacific Gas & Electric Co.*, 114 F.3d 858 (9th Cir. 1997) ................................................................................41

*Duquesne Light Co. v. Barasch*, 488 U.S. 299 (1989) ................................47

*Electric Power Supply Ass'n v. Star*, 904 F.3d 518 (7th Cir. 2018) ...................8

*Empress Casino Joliet Corp. v. Balmoral Racing Club, Inc.*, 651 F.3d 722 (7th Cir. 2011) ................................................................23, 24

*Empress Casino Joliet Corp. v. Blagojevich*, 638 F.3d 519 (7th Cir. 2011), *vacated in part on reh'g*, 649 F.3d 799 (7th Cir. 2011) ........................26

*Empress Casino Joliet Corp. v. Blagojevich*, 674 F. Supp. 2d 993 (N.D. Ill. 2009), *rev'd*, 638 F.3d 519 (7th Cir. 2011), *vacated in part on reh'g*, 649 F.3d 799 (7th Cir. 2011) ........................................................26

*Empress Casino Joliet Corp. v. Johnston*, 763 F.3d 723 (7th Cir. 2014) ...............*passim*

*Fletcher v. Peck*, 10 U.S. (6 Cranch) 87 (1810) ............................12, 16, 17

*Geinosky v. City of Chicago*, 675 F.3d 743 (7th Cir. 2012) ........................39

*Goldwasser v. Ameritech Corp.*, 222 F.3d 390 (7th Cir. 2000) ...........41, 44, 45, 48

*Green v. Peoples Energy Corp.*, No. 02 C 4117, 2003 WL 1712566 (N.D. Ill. Mar. 28, 2003) ................................................................44, 45

*Gunn v. Continental Casualty Co.*, 968 F.3d 802 (7th Cir. 2020) ................39, 46

*H.J. Inc. v. Northwestern Bell Telephone Co.*, 954 F.2d 485 (8th Cir. 1992) ................................................................27, 41, 43, 46, 47

*Hawkins v. Commonwealth Edison Co.*, 2015 IL App (1st) 133678 ...................47

*Hemi Group, LLC v. City of New York*, 559 U.S. 1 (2010) ................28, 29, 34, 35

*Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258 (1992) .........28, 29, 30

*Kansas City v. Federal Pacific Electric Co.*, 310 F.2d 271 (8th Cir. 1962) .......27

*Keogh v. Chicago & Northwestern Railway Co.*, 260 U.S. 156 (1922) ...........45, 47

*Leo v. Nationstar Mortgage LLC*, 964 F.3d 213 (3d Cir. 2020) ...........42, 43, 44, 47

*Marcus v. AT&T Corp.*, 138 F.3d 46 (2d Cir. 1998) ................................44

*McCulloch v. State*, 11 Ind. 424 (1858) .................................................................24

*Menominee Indian Tribe of Wisconsin v. Thompson*, 161 F.3d 449 (7th Cir. 1998) ............................................................................................................39

*Metro East Center for Conditioning & Health v. Qwest Communications International, Inc.*, 294 F.3d 924 (7th Cir. 2002)..............................................48

*Montana-Dakota Utilities Co. v. Northwestern Public Service Co.*, 341 U.S. 246 (1951).........................................................................................................49

*Murphy v. Chicago, Rock Island & Pacific Railway Co.*, 247 Ill. 614 (1910).............22, 24

*Nantahala Power & Light Co. v. Thornburg*, 476 U.S. 953 (1986) .......................49

*Natural Gas Pipeline Co. of America v. Federal Power Commission*, 141 F.2d 27 (7th Cir. 1944) .................................................................................44

*In re New Jersey Title Insurance Litigation*, 683 F.3d 451 (3d Cir. 2012)..................44, 46

*NRP Holdings, LLC v. City of Buffalo*, 916 F.3d 177 (2d Cir. 2019) ...........................21, 31

*Patel v. Specialized Loan Servicing, LLC*, 904 F.3d 1314 (11th Cir. 2018).................44, 46

*Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89 (1984)........................................................................................................19

*Public Advocate v. Philadelphia Gas Commission*, 674 A.2d 1056 (Pa. 1996) ............................................................................................................49

*Rothstein v. Balboa Insurance Co.*, 794 F.3d 256 (2d Cir. 2015) ...................44, 45

*Schafer v. Exelon Corp.*, 619 F. Supp. 2d 507 (N.D. Ill. 2007).............................39

*Sheffler v. Commonwealth Edison Co.*, 2011 IL 110166......................................47

*Slack v. Jacob*, 8 W. Va. 612 (1875)......................................................................22

*Smith v. FirstEnergy Corp.*, 518 F. Supp. 3d 1118 (S.D. Ohio 2021)......................37, 38, 48

*Square D Co. v. Niagara Frontier Tariff Bureau, Inc.* 476 U.S. 409 (1986)...............44, 48

*State ex rel. Pusateri v. Peoples Gas Light & Coke Co.*, 2014 IL 116844 ..........................46

*Sun City Taxpayers' Ass'n v. Citizens Utilities Co.*, 45 F.3d 58 (2d Cir. 1995) ............................................................................................................44, 45

*Taffet v. Southern Co.*, 967 F.2d 1483 (11th Cir. 1992) ........................................27, 43, 46, 47

*Tenney v. Brandhove*, 341 U.S. 367 (1951) ........................................................20, 21

*Texas Commercial Energy v. TXU Energy, Inc.*, 413 F.3d 503 (5th Cir. 2005) ........................................................................................................41

*Thillens, Inc. v. Community Currency Exchange Ass'n of Illinois, Inc.*, 729 F.2d 1128 (7th Cir. 1984) ........................................................20, 21

*Town of Norwood v. New England Power Co.*, 202 F.3d 408 (1st Cir.2000) ........48

*United States v. Lewis*, 411 F.3d 838 (7th Cir. 2005) ........................................39

*Virginia Uranium, Inc. v. Warren*, 139 S. Ct. 1894 (2019)............................20, 21

*Wah Chang v. Duke Energy Trading & Mktg., LLC*, 507 F.3d 1222 (9th Cir. 2007) ........................................................................................................44

*Waste Management of Louisiana L.L.C. v. River Birch, Inc.*, 920 F.3d 958 (5th Cir. 2019) ........................................................................................37

*Wegoland Ltd. v. NYNEX Corp.*, 27 F.3d 17 (2d Cir. 1994) ....................42, 43, 47

*In re Wheat Rail Freight Rate Antitrust Litigation*, 759 F.2d 1305 (7th Cir. 1985) ........................................................................................................42

*Williams v. Duke Energy International, Inc.*, 681 F.3d 788 (6th Cir. 2012) ........48

## Statutes

18 U.S.C. § 1964(c) ........................................................................................28, 33

20 ILCS 3855/1-56 ..............................................................................................8

20 ILCS 3855/1-75(c)(1)(K) ..............................................................................8

20 ILCS 3855/1-75(d-5) ......................................................................................8

20 ILCS 3855/1-75(d-5)(1)(A) ..........................................................................9

20 ILCS 3855/1-75(d-5)(1)(B) ..........................................................................9

20 ILCS 3855/1-75(d-5)(1)(C) ..........................................................................9

20 ILCS 3855/1-75(d-5)(6) ........................................................................9, 10, 41

20 ILCS 3855/1-75(d-10) ..................................................................................11

220 ILCS 5/4-604.5(a) .................................................................................11

220 ILCS 5/4-604.5(b) ..........................................................................11, 23

220 ILCS 5/8-103B(b) .............................................................................11

220 ILCS 5/8-103B(b-5) ...........................................................................11

220 ILCS 5/8-103B(d)(1) .........................................................................41

220 ILCS 5/8-103B(d)(2) .........................................................................11

220 ILCS 5/9-102 .................................................................................41

220 ILCS 5/9-104 .................................................................................41

220 ILCS 5/9-201 *et seq.* .........................................................................4

220 ILCS 5/16-108.5(b)(1) .......................................................................40

220 ILCS 5/16-108.5(b)(1)(A)(i) ..................................................................4

220 ILCS 5/16-108.5(b)(1)(A)(iii) ................................................................4

220 ILCS 5/16-108.5(b)(1)(A)(iv) ................................................................4

220 ILCS 5/16-108.5(b)(1)(B)(i) ..................................................................5

220 ILCS 5/16-108.5(b)(1)(B)(ii) .................................................................5

220 ILCS 5/16-108.5(b)(1)(B)(iii) ................................................................5

220 ILCS 5/16-108.5(b)(1)(B)(iv) ................................................................5

220 ILCS 5/16-108.5(b-5) ..........................................................................5

220 ILCS 5/16-108.5(c) .......................................................................4, 5, 40

220 ILCS 5/16-108.5(c)(1) .....................................................................5, 33

220 ILCS 5/16-108.5(c)(3) .........................................................................6

220 ILCS 5/16-108.5(d) .......................................................................4, 5, 40

220 ILCS 5/16-108.5(d)(1) ..........................................................................5

220 ILCS 5/16-108.5(d)(3) .........................................................................33

220 ILCS 5/16-108.5(f-5) ................................................................6

220 ILCS 5/16-108.5(h) ..................................................................8

P.A. 097-0616, § 16-108.5(a) ......................................................3, 4

P.A. 098-0015 ................................................................................6

P.A. 099-0906, § 1.5 ...................................................................8, 9

P.A. 102-0662 ..............................................................................11

## OTHER AUTHORITIES

83 Ill. Admin. Code § 287.20 ........................................................4

Brief of Amici Curiae Natural Resource Defense Council, Environmental
    Defense Fund, CUB, Elevate Energy and Respiratory Health Ass'n in
    Support of Defendants-Appellees and Affirmance, *Village of Old Mill
    Creek v. Star*, 904 F.3d 518 (7th Cir. 2018) (Nos. 17-2433, 17-2445), 2017
    WL 5186513 .............................................................................8

*In re: Commonwealth Edison Company Illinois Consumer Fraud
    Litigation*, 2020-CH-05138 (Cook Cnty. Cir. Ct.) ...................10

Illinois Commerce Commission, et al., *Potential Nuclear Power Plant
    Closings in Illinois: Impacts and Market-Based Solutions*
    (Jan. 5, 2015), https://www.ilga.gov/reports/special/Report_Potential
    %20Nuclear%20Power%20Plant%20Closings%20in%20IL.pdf ...................9

Memorandum by Arlington Park Racecourse, LLC. in support of motion to
    dismiss, *Empress Casino Joliet Corp. v. Blagojevich*, No. 09-cv-3585
    (N.D. Ill. Aug. 31, 2009), ECF No. 47 ...................................26

Memorandum by Hawthorne Race Course, Inc. in support of motion to
    dismiss, *Empress Casino Joliet Corp. v. Blagojevich*, No. 09-cv-3585
    (N.D. Ill. Aug. 31, 2009), ECF No. 44 ...................................26

Memorandum by Rod Blagojevich, Friends of Blagojevich in support of
    motion to dismiss, *Empress Casino Joliet Corp. v. Blagojevich*, No. 09-
    cv-3585 (N.D. Ill. July 31, 2009), ECF No. 33 ........................26

Memorandum Order on Defendants' Motion to Dismiss, *In re:
    Commonwealth Edison Company Illinois Consumer Fraud Litigation*,
    No. 2020-CH-05138 (Cook Cnty. Cir. Ct. Dec. 23, 2021) ................ 10-11

Motion by Plaintiff State of Ohio for Temporary Restraining Order & Preliminary Injunction, *Ohio v. FirstEnergy*, Case No. 20-CV-6281 (Ohio Ct. Common Pleas, Franklin Cty. Jan. 13, 2021), https://www.ohio attorneygeneral.gov/Files/Briefing-Room/News-Releases/2021-01-13-YOST-PI-Motion-for-FirstEnergy-Decoupli.aspx ...................................................... 37-38

Order, *Commonwealth Edison Co.*, ICC Docket No. 12-0321 (Dec. 19, 2012), https://icc.illinois.gov/docket/P2012-0321/documents/191435 ........................................... 7

Order, *Commonwealth Edison Co.*, ICC Docket No. 13-0318 (Dec. 18, 2013), http://icc.illinois.gov/docket/P2013-0318/documents/207264 ............................................ 6

Order, *Commonwealth Edison Co.*, ICC Docket No. 15-0287 (Dec. 9, 2015), https://icc.illinois.gov/docket/P2015-0287/documents/237272 ........................................... 7

Order, *Commonwealth Edison Co.*, ICC Docket No. 20-0393 (Dec. 9, 2020), https://icc.illinois.gov/docket/P2020-0393/documents/305841 ................................. 6-7, 33

Order, *Illinois Power Agency Petition For Approval of the IPA's Zero Emission Standard Procurement Plan*, ICC Docket No. 17-0333 (Sept. 11, 2017), https://www.icc.illinois.gov/docket/P2017-0333/documents/256557/files/453601.pdf .......................................................................... 10

1 *Sutherland Statutory Construction* § 13:17, Westlaw (7th ed. database updated Nov. 2021) ........................................................................................... 22

## INTRODUCTION

Plaintiffs claim to have been injured by paying electric rates authorized by a series of duly enacted Illinois statutes: the 2011 Energy Infrastructure Modernization Act ("EIMA"), 2013 amendments to EIMA, and the 2016 Future Energy Jobs Act ("FEJA"). These laws reflect a decision by the State that its utilities should make significant investments to harden and modernize the electric grid, and to maintain the operation of zero-carbon nuclear plants.  The utilities spent that money and recovered the costs in rates.  Plaintiffs do not challenge the validity of the laws themselves, nor do Plaintiffs dispute that the rates were authorized by those laws.  Instead, they demand a refund, in the form of civil damages, of the rates customers paid, based on alleged improprieties in the legislative process.

The district court correctly dismissed this case as barred by foundational separation-of-powers principles.  A court cannot treat the legislature's enactments as illegitimate, nor entertain a collateral attack on those enactments by undoing through a damages award what the law expressly authorizes.  Nor may a court interrogate legislators' subjective motivations for passing a law, as would be required to show (as Plaintiffs allege) that the law passed due to the corruption of one legislator.  And where, as here, a *federal* court is asked to collaterally attack a validly enacted *state* law, the separation-of-powers problems are compounded by federalism problems.

The district court also correctly held that Plaintiffs failed to plead proximate cause, which requires a direct relationship between an alleged illegal act and the plaintiff's injury.  Here, Plaintiffs have alleged at most that, but for Madigan's approval,

the legislation would not have passed: in other words, a *but-for* cause.  The Complaint (SA-1-74) fails to plead that Madigan directly caused the statutes' passage and could not plausibly do so.  EIMA, the 2013 amendments to EIMA, and FEJA each passed both houses of the legislature—the House and the Senate—with overwhelming bipartisan support, and FEJA was signed by the Governor.

Finally, this Court can also affirm based on the filed rate doctrine, which bars suits seeking damages for amounts paid under a filed tariff.  Awarding damages in such a case would require a court to decide what "proper" rates *should* have been: for example, which investments in grid hardening, modernization, and clean power should or should not have been made, and what rate customers should have paid for the service they received.  But the filed rate doctrine holds that a court may not do so.

None of this is to say that Plaintiffs are without a remedy if there were a legislative wrong.  But "the cure may not lie in civil litigation in the courts."  *Empress Casino Joliet Corp. v. Johnston*, 763 F.3d 723, 731 (7th Cir. 2014).  Instead, the legislature has the power to provide a remedy by changing the law, and the criminal process exists to punish illegal conduct.  Here, Commonwealth Edison Company ("ComEd") paid a $200 million penalty as part of its Deferred Prosecution Agreement ("DPA").[1]  And, following the DPA, the General Assembly enacted new comprehensive energy legislation that directed the Illinois Commerce Commission ("ICC") to investigate ComEd's past rates for DPA-related costs and authorized tailored refunds.  The General Assembly also *expanded* the nuclear support and energy efficiency programs enacted in FEJA, to which Plaintiffs

---

[1] Exelon Corporation ("Exelon"), ComEd's parent, was not a party to the DPA.

object.  Plaintiffs may wish that the General Assembly had authorized broader refunds, or cut back on state support for energy efficiency and nuclear power, but that disagreement with the legislature's decisions on state policy does not give them a cause of action in federal court.

## JURISDICTIONAL STATEMENT

Plaintiffs' jurisdictional statement is complete and correct.

## QUESTIONS PRESENTED

1.      Whether the district court correctly held that the separation of powers precludes Plaintiffs from stating a claim.

2.      Whether the district court correctly held that Plaintiffs failed to allege proximate causation.

3.      Whether the filed rate doctrine bars Plaintiffs' claim.

## STATEMENT OF THE CASE

### A. The Energy Infrastructure and Modernization Act

EIMA was passed in 2011 by a supermajority in both the House and Senate, following extensive and prolonged storm-related power outages that exposed the vulnerability of the electric grid.  EIMA was passed to encourage the State's two major utilities—ComEd and Ameren Illinois ("Ameren")—to invest in and improve the grid's reliability, resilience, and performance.  P.A. 097-0616, § 16-108.5(a).

EIMA gave ComEd and Ameren a choice: if they committed to spending billions of dollars to modernize and harden the State's electric grid, they could recover their costs of delivering electricity through a formula rate that would update automatically each year

to reflect the actual costs of serving customers determined by the ICC to be prudent and reasonable.

A formula rate eliminates a lag between when a utility incurs costs and (after ICC review) when those costs begin to be recovered in rates. The prior ratemaking structure, known as "Article IX" ratemaking, *see* 220 ILCS 5/9-201 *et seq.*, frequently resulted in such a lag and so discouraged large-scale, long-term investments. Rates were set based on a single twelve-month "test year," 83 Ill. Adm. Code § 287.20; *Commonwealth Edison Co. v. Ill. Commerce Comm'n*, 405 Ill. App. 3d 389, 395 (2d Dist. 2010), and were adjusted only on an *ad hoc* basis, often after significant delay. By contrast, EIMA required rates to be updated annually based on "the utility's actual costs to be recovered during the applicable rate year," subject to ICC review for prudence and reasonableness. 220 ILCS 5/16-108.5(c), (d). The General Assembly found that customers and the State would benefit: "regulatory reform measures that increase predictability, stability, and transparency in the ratemaking process are needed to promote prudent, long-term infrastructure investment and to mutually benefit the State's electric utilities and their customers, regulators, and investors." P.A. 097-0616, § 16-108.5(a).

Both ComEd and Ameren chose to make the EIMA commitment, and for the last decade customers have received the benefits of placing distribution infrastructure underground and refurbishing mainline cable systems, 220 ILCS 5/16-108.5(b)(1)(A)(i); inspecting, treating, and repairing wood poles, *id.* § 16-108.5(b)(1)(A)(iii); hardening the grid with new storm-resistant equipment, *id.* § 16-108.5(b)(1)(A)(iv); installing automated control and switching systems to automatically detect and remedy problems and reduce

outages, *id.* § 16-108.5(b)(1)(B)(ii)-(iv); deploying cyber-secure communication networks, *id.*; and installing smart meters and supporting infrastructure, which provide real-time information concerning energy usage and power flows to the utilities and customers, *id.* § 16-108.5(b)(1)(B)(i).

Plaintiffs assert that EIMA "eliminat[ed] the power of … the ICC … to inquire into ComEd's actual expenses before rubber-stamping guaranteed rate increases." Br. 9-10; *see also* Compl. ¶¶151,160. That is incorrect as a matter of law. Under EIMA, each year, the utility is required to present its "actual costs" to the ICC. 220 ILCS 5/16-108.5(d)(1). The ICC must determine whether they are "prudently incurred and reasonable in amount." *Id.* § 16-108.5(c)(1). To do so, the ICC may—and each year did— "enter upon a hearing concerning the prudence and reasonableness of the costs incurred by the utility." *Id.* § 16-108.5(d). Discovery is authorized, testimony is taken, and the ICC "appl[ies] the same evidentiary standards, including, but not limited to, those concerning the prudence and reasonableness of the costs incurred by the utility, in the hearing as it would apply in a hearing to review a filing for a general increase in rates under Article IX of this Act." *Id.*; *see also id.* § 16-108.5(c) (similar); *id.* § 16-108.5(b-5) (underscoring that the ICC may "investigat[e] the prudence and reasonableness of … expenditures … and shall … determine whether the utility's actual costs under the program are prudent and reasonable"). EIMA also requires annual reconciliation of rates with the prior year's actual costs, ensuring that rates reflect the utility's actual costs. *Id.* § 16-108.5(d)(1). Reconciliation affords the ICC a second opportunity to review the prudence and reasonableness of those costs.

EIMA also provided that ComEd could earn a return on equity equal to the U.S. Treasury bond yield plus a fixed adjustment of 580 basis points (5.8%). *Id.* § 16-108.5(c)(3). While Plaintiffs describe this as a "guaranteed profit," Br. 10, utilities are always entitled to earn a return on their equity investment—that is nothing new. *See Bluefield Waterworks & Improvement Co. v. Pub. Serv. Comm'n*, 262 U.S. 679, 692-93 (1923). In fact, EIMA's prescribed rate of return was *lower* than the ICC had previously approved, *see* ECF No. 85 at 6 n.2 (collecting citations), and even that return was subject to reduction if certain performance standards were not met. 220 ILCS 5/16-108.5(f-5).

EIMA was amended in 2013 to clarify certain aspects of how the formula operated, but those amendments did not change the requirement that the ICC review ComEd's costs every year for prudence and reasonableness, based on evidence, before they could be included in rates. *See* P.A. 098-0015.

Consistent with the statute's text, the ICC annually conducted formal, litigated proceedings to review ComEd's rate updates. ComEd filed detailed data and sworn testimony concerning its costs, and it received discovery requests from parties including the Attorney General, the Citizens Utility Board ("CUB"), and the ICC's professional Staff. The ICC addressed this evidence in orders approving updated rates, finding that ComEd's investments (known as "Plant") were prudent, the costs were reasonable, and the assets are "used and useful" in providing utility service to customers.[2] When the ICC

---

[2] *E.g.*, Order at 5, *Commonwealth Edison Co.*, ICC Docket No. 13-0318 (Dec. 18, 2013) (ICC finding that ComEd's Distribution Plant was "prudently acquired at a reasonable cost and was used and useful when placed into service"), http://icc.illinois.gov/docket/P2013-0318/documents/207264; Order at 5-6, *Commonwealth Edison Co.*, ICC Docket No. 20-0393 (Dec. 9, 2020) ("2020 Order") (finding, post-DPA, that ComEd's assets "were prudently acquired at a

determined that standard was not met with regard to certain costs, it excluded those costs from rates.[3]  The ICC then directed ComEd to file updated rates each year in strict compliance with its orders, which ComEd did.[4]

The ICC was emphatic that EIMA preserved its authority to disallow claimed costs that were imprudent, unreasonable, or inadequately supported.  It held that utilities must "provide specific evidence, in every [EIMA ratemaking] proceeding … as to what it intends to spend [on EIMA-related investments] … and specific evidence establishing what it has already spent Section 16-108.5 money on for reconciliation purposes."[5]  The ICC determined this detail is necessary because "nothing in Section 16-108.5 of the Act states that such proceedings should have a lessening of Article IX scrutiny.  Quite the contrary, Section 16-108.5 *requires* such scrutiny."[6]

The Illinois Appellate Court likewise repeatedly confirmed that the ICC must apply the traditional "prudence and reasonableness" standard when deciding what costs could be charged in rates under EIMA.  The court rejected the notion that EIMA "creates

---

reasonable cost and are used and useful" and "are necessary to provide" utility service to customers),  https://icc.illinois.gov/docket/P2020-0393/documents/305841; ECF No. 85 at 9 n.5 (collecting cites to ICC orders from each year of EIMA).

[3] *E.g.*, Order at 56-57, *Commonwealth Edison Co.*, ICC Docket No. 12-0321 (Dec. 19, 2012) ("2012 Order") (rejecting recovery of rate case-related expenses as insufficiently supported to permit finding of prudence and reasonableness), https://icc.illinois.gov/docket/P2012-0321/documents/191435; Order at 61-62, *Commonwealth Edison Co.*, ICC Docket No. 15-0287 (Dec. 9, 2015) (rejecting as unreasonable recovery of costs for profit-sharing match contributed to ComEd's employee savings plan), https://icc.illinois.gov/docket/P2015-0287/documents/237272; *id*. at 65-66 (rejecting smart meter marketing costs as imprudent and unreasonable).

[4] *See* ECF No. 85 at 9 n.7 (collecting cites to ComEd's compliance filings).

[5] 2012 Order at 98.

[6] *Id.* at 97 (emphasis in original).

a presumption of reasonableness," and emphasized that "[t]he plain language of the statute" enabled the ICC to determine whether each component of a utility's rates is "prudent and reasonable." *Ameren Ill. Co. v. Ill. Commerce Comm'n*, 2013 IL App (4th) 121008, ¶ 29; *see also Commonwealth Edison Co. v. Ill. Commerce Comm'n*, 2014 IL App (1st) 130302, ¶ 55; *Commonwealth Edison Co. v. Ill. Commerce Comm'n*, 2014 IL App (1st) 122860, ¶¶ 56-57.

### B. The Future Energy Jobs Act

In 2016, the General Assembly enacted FEJA, P.A. 099-0906, by a lopsided bipartisan vote in both chambers, with the support of a broad coalition of stakeholders including labor, environmental organizations, and CUB.[7]  Governor Rauner signed the bill.  FEJA implemented measures promoting clean energy, energy efficiency, and continued investment in a reliable grid.  20 ILCS 3855/1-56; *id.* § 1-75(c)(1)(K).  FEJA extended EIMA's ratemaking framework through 2022.  220 ILCS 5/16-108.5(h).  It also created zero emission credits ("ZECs") to prevent the retirement of nuclear plants, which do not emit carbon dioxide.  20 ILCS 3855/1-75(d-5); *see Elec. Power Supply Ass'n v. Star*, 904 F.3d 518 (7th Cir. 2018) (describing ZEC program).

---

[7] *See, e.g.*, Br. of Amici Curiae Nat. Res. Defense Council, Envt'l Defense Fund, Citizens Utility Board, *et al.*, at 2-3, *Vill. of Old Mill Creek v. Star*, 904 F.3d 518 (7th Cir. 2018) (Nos. 17-2433, 17-2445), 2017 WL 5186513 (stating that "Amici … advocated for [FEJA's] passage," and "jointly and strongly support FEJA as a whole because of the important clean energy, consumer, human health, and environment measures it includes").

The General Assembly's consideration of FEJA followed a study by four Illinois state agencies ("Agency Report"), including the ICC.[8]  The report found that several nuclear plants owned by Exelon Generation, LLC ("ExGen"), were earning insufficient revenues to cover their costs and faced closure.  Agency Report at 39.  For example, the Quad Cities plant required almost a 50% increase in revenue to cover its costs.  *Id.*  Yet nuclear plant closures would result in substantially higher bills for ComEd customers, *id.* at 57-58, 62, could degrade service reliability, *id.* at 69, and would result in significantly increased emission of carbon and other air pollutants.  *Id.* at 118-19.  The report valued the societal cost of increased emissions resulting from a single nuclear plant retirement to be more than $3.7 billion between 2020 and 2029.  *Id.* at 119.  Nuclear plant closures would also cause the loss of thousands of jobs and nearly $2 billion in lost economic activity.  *Id.* at 125.

Based on these findings, *see* FEJA, P.A. 099-0906, § 1.5, the General Assembly directed the Illinois Power Agency ("IPA") to receive applications from and, subject to ICC review and approval, select at-risk nuclear power plants whose continued operation would best advance Illinois's environmental goals, 20 ILCS 3855/1-75(d-5)(1)(C).  The legislation directed the IPA to procure ZECs from those nuclear plants at a price based upon the "[s]ocial [c]ost of [c]arbon," a measure of the environmental benefits afforded by the plants' continued operation.  *Id.* 1-75(d-5)(1)(A), (B).  The cost was to be recovered through ICC-approved rates.  *Id.* 1-75(d-5)(6).

---

[8] *See* Ill. Com. Comm'n, et al., *Potential Nuclear Power Plant Closings in Illinois: Impacts and Market-Based Solutions* at 1- 2 (Jan. 5, 2015), https://www.ilga.gov/reports/special/Report_Potential%20Nuclear%20Power%20Plant%20Closings%20in%20IL.pdf.

After a public procurement process in which all nuclear plants in the multi-state region could participate,[9] the IPA selected two plants owned by ExGen, and the ICC approved that selection. With ICC oversight, ComEd entered into contracts to procure the credits. ComEd then filed, and the ICC approved, a tariff allowing ComEd to recover the costs from customers in its rates. *See* 20 ILCS 3855/1-75(d-5)(6).

### C. The Deferred Prosecution Agreement and Plaintiffs' Suit

On July 17, 2020, ComEd entered a DPA with the U.S. Department of Justice, in which ComEd admitted that certain of its officers and employees took actions in an effort to influence and reward the Illinois House Speaker's efforts to assist ComEd with respect to legislation, including EIMA and FEJA. As part of the DPA, ComEd paid a $200 million criminal penalty and agreed to certain remedial and other measures. Neither Exelon (ComEd's parent company), nor any Exelon affiliate other than ComEd (including ExGen), was a party to the DPA.

Shortly thereafter, seven class-action complaints were filed against ComEd and Exelon—three in Cook County Circuit Court and four in federal court. Additionally, CUB intervened. The state actions were consolidated in state court, *see* 2020-CH-05138 (Cook Cnty. Cir. Ct.), and the federal actions were consolidated in the district court, ECF Nos. 48, 64. On December 23, 2021, the state-court actions were dismissed with prejudice on separation-of-powers grounds. Memorandum Order on Defendants' Motion to

---

[9] *See* Order at 23, 30-31, 34-35, *Illinois Power Agency Petition For Approval of the IPA's Zero Emission Standard Procurement Plan*, ICC Docket No. 17-0333 (Sept. 11, 2017), https://www.icc.illinois.gov/docket/P2017-0333/documents/256557/files/453601.pdf.

Dismiss, No. 2020-CH-05138 (Cook Cnty. Cir. Ct. Dec. 23, 2021) (attached in Defendants-Appellees' Supplemental Appendix).

### D. Post-DPA Legislative Action

While this case was pending, the Illinois General Assembly passed new energy legislation, P.A. 102-0662, which Governor Pritzker signed into law on September 15, 2021. Responding to the DPA, the new legislation included specific investigation and refund authority. It required the ICC to "initiate an investigation as to whether Commonwealth Edison collected, spent, allocated, transferred, remitted, or caused in any other way to be expended ratepayer funds in connection with the conduct detailed in the [DPA]…." 220 ILCS 5/4-604.5(b). Any expenditure of ratepayer funds that "were not lawfully recoverable through rates" must be "refunded to ratepayers." *Id.* § 5/4-604.5(a), (b). However, the General Assembly did not prematurely terminate EIMA ratemaking, but instead allowed EIMA to expire on the timeline established by prior law.

The legislation also affirmed and expanded FEJA's policy regarding nuclear plants by providing additional support, called Carbon Mitigation Credits, to other nuclear plants, *see* 20 ILCS 3855/1-75(d-10); 220 ILCS 5/8-103B(b), (b-5), (d)(2). It also increased the scale of FEJA's energy efficiency programs, 220 ILCS 5/8-103B(b), (b-5). Thus, the General Assembly confirmed, with full knowledge of the DPA, that those FEJA-related programs are part of the energy policy of Illinois.

### E. The District Court's Dismissal

On September 9, 2021, the district court dismissed Plaintiffs' suit with prejudice. The court began by addressing the filed rate doctrine. It observed that "[t]his defense

11

would seem to be a slam dunk in a case in which plaintiffs seek money damages as reimbursement for the inflated rates they paid for … electricity." SA-200.  Nevertheless, the court held that it could not consider the filed rate doctrine because, in its view, the filed rate doctrine is an affirmative defense and the Complaint did not expressly admit that "the rates plaintiffs paid for the electricity they used were filed." SA-201.

The court then turned to proximate causation and held that Plaintiffs' allegations failed to state a claim.  The court noted that the "central question … is whether the alleged violation led directly to the plaintiff's injuries." SA-203 (quoting *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006)).  While Plaintiffs had "alleged but-for causation," they had not alleged facts showing "that the bribery of Madigan was the proximate cause of the bills' ultimate passage." SA-205-06.  The district court explained that allegations that Madigan "successfully pressured" certain members to vote for the legislation were insufficient for proximate cause, because such legislators regularly pressure each other in lawful ways. SA-207.  "To state a claim, plaintiffs need to allege Madigan provided the votes by placing *improper* pressure on lawmakers." *Id.*  Plaintiffs failed to do so, because their allegations regarding these other legislators were consistent with lawful conduct. SA-206-07.

The district court then held that Plaintiffs could not cure their defective pleading because they sought damages based on compliance with unchallenged laws, "all based on the motives of the legislators."  SA-211.  As the court explained, the separation of powers—tracing back to the Supreme Court's decision in *Fletcher v. Peck*, 10 U.S. (6 Cranch) 87, 130-31 (1810)—does not allow such a claim.  The court noted that it had "no

reason to think the State of Illinois is unhappy with the law.  Nor does the Court have

any reason to think the constituents are unhappy with the law." SA-210.  It continued:

> In a state with an electorate that expresses concern about climate change,
> perhaps the constituents preferred to subsidize reliable, zero-emission
> nuclear power... Perhaps the constituents wanted a modernized energy-
> delivery system.  The legislature is the branch of government most
> responsive to the electorate.  This Court shares *Fletcher*'s concern about a
> court, in effect, overruling the decisions of a State legislature based on ...
> alleged improper motives...

SA-210.  As the court explained, Plaintiffs were in effect collaterally attacking these

legislative decisions:

> Plaintiffs believe that any amounts defendants were able to collect from
> plaintiffs (in the form of higher rates for the electricity plaintiffs used) on
> account of the three laws should be given back to the plaintiffs in the form
> of damages... How ... is that different from nullifying those laws? Plaintiffs
> are certainly arguing that the rates—that are a product of those State
> laws—are nullities.  The plaintiffs want this Court to order defendants to
> reimburse plaintiffs for those increased rates in the form of damages on a
> civil claim.  The State legislature giveth, and the federal court taketh
> away.... In essence, plaintiffs' RICO claim is a collateral attack on three
> Illinois laws.

SA-211.

The district court additionally held that Plaintiffs' suit violates the separation of

powers because "[i]t is not possible to determine the merits of the ... proximate cause

issue without considering the motives of the legislators who voted for the bill," and "[b]y

contemplating" those motives, "the Court would be violating *Fletcher v. Peck*." SA-211.

Finally, the district court declined to exercise supplemental jurisdiction over

Plaintiffs' remaining state-law claims.  SA-212.  Plaintiffs refiled those claims in state

court and they, too, were subsequently dismissed on separation-of-powers grounds.

## SUMMARY OF ARGUMENT

Plaintiffs claim to have been "injured by ... legislation" enacted by the Illinois General Assembly.  Compl. ¶23.  They do not claim the legislation was unconstitutional or otherwise invalid, nor have they sought to strike it down or enjoin it.  Nevertheless, they seek damages from paying electric rates that the legislation authorized, because of allegations that Speaker Michael Madigan corruptly "wielded his enormous power and influence to ensure passage [of the legislation] through the Illinois legislature."  *Id.* ¶1.

The district court correctly dismissed the Complaint with prejudice.  Under foundational separation-of-powers and federalism principles, a federal court cannot entertain a civil damages action that seeks to convert rates lawfully collected under a valid and unchallenged state law into a "wrongfully-obtained windfall" that must be "repa[id]," Compl. ¶7, based on allegations that the legislative process was infected by corruption.  Such a suit asks the court to treat validly enacted state law as illegitimate due to alleged improper legislative motive, which the court cannot do.  And to prove the requisite proximate cause, Plaintiffs' suit would require the Court to trace causation through the state legislative process, supervising invasive discovery of legislators and their staffs and reconstructing the subjective motivations of legislators.  The Court cannot do that, either.  In such circumstances, "the cure may not lie in civil litigation in the courts."  *Empress Casino*, 763 F.3d at 731.

The district court also correctly dismissed the Complaint on the ground that, apart from the separation-of-powers problems, it also failed even to allege facts sufficient to establish that the alleged wrong directly caused the alleged injury, as required under

RICO's proximate cause standard.  Plaintiffs allege at most but-for causation.  EIMA, the 2013 EIMA amendments, and FEJA each passed with broad bipartisan support in both the House and Senate.  FEJA was signed by the Governor.  There is no allegation of corruption on the part of any legislator other than Madigan, nor any well-pleaded allegation that Madigan improperly influenced any other legislator in the House, let alone the Senate.  The district court thus correctly held that the decisions made by scores of legislators to vote for this legislation are, as a matter of law, an intervening cause that interrupts any direct relationship between the conduct admitted in the DPA and the injuries alleged by Plaintiffs.

Finally, dismissal with prejudice is compelled by the filed rate doctrine.  The district court correctly recognized that the filed rate doctrine "would seem to be a slam dunk" in this case, SA-200, as Plaintiffs claimed to be injured by paying electric rates filed in tariffs. However, the court did not reach the issue because the Complaint does not expressly allege that the rates were filed with the ICC.  But the Complaint describes EIMA and FEJA, and both statutes expressly require that the rates they authorize be filed with the ICC.  Moreover, judicially noticeable documents—such as ICC orders and tariffs—show such rates were filed.  Accordingly, the filed rate doctrine was properly before the district court and provides an additional ground for affirmance.

## STANDARD OF REVIEW

The district court's dismissal for failure to state a claim is reviewed *de novo*. *Active Disposal, Inc. v. City of Darien*, 635 F.3d 883, 886 (7th Cir. 2011).

## ARGUMENT

I.   **The District Court Correctly Held That the Separation of Powers Prevented Plaintiffs from Stating a Claim.**

Plaintiffs claim that they were "injured by the legislation," Compl. ¶23, because those "bills permit[ted] ComEd to charge higher electric rates, assess new fees, and collect increased profits." *Id.* ¶1.  Plaintiffs do not argue that EIMA or FEJA are unconstitutional or otherwise invalid.  Yet they nevertheless claim that the amounts ComEd collected under these concededly valid laws were "wrongfully-obtained" and must be "repa[id]." *Id.* ¶ 7.  Plaintiffs, in other words, want a refund in the form of civil damages of the legally authorized charges they paid for utility service they received, based on allegations about improprieties in the legislative process.

The district court correctly held that the separation of powers—as articulated in the foundational case of *Fletcher v. Peck*, 10 U.S. (6 Cranch) 87 (1810)—bars exactly that type of claim.   A plaintiff may not claim legally cognizable injury from paying charges authorized by an unchallenged law, based on allegations about legislators' motivations.

*Fletcher* involved a Georgia law, procured by bribery, that upset a buyer's contract to purchase land.  10 U.S. at 129.  The buyer then sued the seller for breach of contract. *Id.*  The Court dismissed the suit, holding that the Georgia law must be given effect regardless of allegations about improprieties surrounding its enactment:

> It would be indecent, in the extreme, upon a private contract, between two individuals, to enter into an inquiry respecting the corruption of the sovereign power of a state….  [I]f the act be clothed with all the requisite forms of a law, a court, sitting as a court of law, cannot sustain a suit brought by one individual against another founded on the allegation that the act is a nullity, in consequence of the impure motives which influenced certain members of the legislature which passed the law.

*Id.* at 131.  The Court identified the questions that such a claim would generate, which a court would not be competent to decide:

> Must the vitiating cause operate on the majority, or on what number of the members? Would the act be null, whatever might be the wish of the nation, or would its obligation or nullity depend upon the public sentiment?
>
> If the majority of the legislature be corrupted, it may well be doubted, whether it be within the province of the judiciary to control their conduct, and, if less than a majority act from impure motives, the principle by which judicial interference would be regulated, is not clearly discerned.

*Id.* at 130.  While the Court left open the possibility that the State might itself bring such a suit, "[t]his solemn question cannot be brought thus collaterally and incidentally before the court" in a suit between private parties for civil damages.  *Id.* at 131.

Though decided more than 200 years ago, "*Fletcher* has not been forgotten."  SA-209 (citing *Empress Casino*, 763 F.3d at 728).  Instead, its holding has been distilled into two related principles, each of which applies with full force in this case.

### A. The Court May Not Entertain a Claim of Injury from Unchallenged Laws, Based on Allegations of Legislative Improprieties.

First, an unchallenged law duly enacted by the legislature is valid and binding, regardless of alleged improprieties in the legislative process.  Thus, a plaintiff cannot seek damages resulting from an unchallenged law based on alleged corruption in the legislative process.  But Plaintiffs here do just that.  They claim that lawfully collected charges are instead "wrongfully-obtained" amounts that must be repaid because of legislative improprieties.  Compl. ¶7.  Thus, their claim effectively seeks to nullify the law's authorization to collect those charges.  A court cannot provide that relief.  *Fletcher*, 10 U.S. at 130-31.

This Court invoked this principle in *Empress Casino*.  There, casinos asserted RICO claims against members of the horseracing industry arising from their bribery of Governor Blagojevich in relation to two laws—a 2006 Act and a 2008 Act.  Each collected a tax on casinos and placed the proceeds in a trust for the benefit of the horseracing industry.  Regarding the '06 Act, the casinos alleged that the racetracks "bribed Governor Blagojevich to push the '06 Act through the state legislature." 763 F.3d at 728.  While the Court held that the plaintiff failed to prove proximate cause, it also observed that whether "a RICO suit could be based on such an allegation" is "a questionable proposition." *Id.*  It reasoned that the "work of state legislatures lies at the heart of the 'Republican Form of Government' that the Constitution mandates."  *Id.* at 730.  Citing *Fletcher*, it stated that "even if the evidence were strong" that "one corrupt official … had hijacked this foundational institution of state sovereignty … *the cure may not lie in civil litigation in the courts*."  *Id.* at 730-31 (emphasis added).

By contrast, the Court permitted the *Empress* case to proceed with respect to the '08 Act, which involved a quid pro quo agreement in which the governor agreed to sign legislation in exchange for a campaign contribution by the racetracks.  The allegations with respect to the '08 Act did not require the court to disregard the result of the legislative process or treat the legislative process as illegitimate.  Rather, the allegations about the '08 Act concerned the bribery of the Governor to sign legislation following the conclusion of the legislative process.

Courts have likewise cited *Fletcher* to hold that antitrust injury may not stem from state action, even amidst allegations that the state action was procured by bribery.

18

Instead, courts must conclusively presume duly enacted legislation to be in the public interest. *See City of Columbia v. Omni Outdoor Advertising, Inc.*, 499 U.S. 365, 377-78 (1991) (citing *Fletcher*). As the Third Circuit explained: "Liability for injuries caused by … state action is precluded even where it is alleged that a private party urging the action did so by bribery…. The remedy for such conduct rests with laws addressed to it and not with courts looking behind sovereign state action" even "with respect to private parties who have urged the state action." *Armstrong Surgical Ctr., Inc. v. Armstrong Cnty. Mem'l Hosp.*, 185 F.3d 154, 162 (3d Cir. 1999).

Plaintiffs' suit is plainly barred by this first principle. Plaintiffs have not challenged the validity of EIMA or FEJA. Yet they nevertheless seek damages consisting of the rates those laws authorized. *Fletcher* bars such a suit. Moreover, the force of *Fletcher*'s holding is amplified in this case by the federalism problems that would otherwise result. Plaintiffs ask a *federal* court to impose civil damages for implementing an unchallenged *state* law. It is hard to imagine a greater intrusion on state sovereignty than a federal court's decision to treat a state law as illegitimate because of alleged irregularities in the state legislative process, absent any claim that the state law is unconstitutional or otherwise invalid under federal law. *Cf. Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984) ("[I]t is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law.").

19

**B. The Court May Not Inquire into the Motives of the Legislators Who Passed EIMA and FEJA.**

The second principle derived from *Fletcher* is that courts may not dissect legislators' motivations in a civil damages action. Indeed, since *Fletcher*, it "has remained unquestioned" "that it was not consonant with our scheme of government for a court to inquire into the motives of legislators." *Tenney v. Brandhove*, 341 U.S. 367, 377 (1951).

Importantly, "[t]his is not a problem of proof" that can be overcome with evidence or that can pleaded around. *Chappell v. Robbins*, 73 F.3d 918, 921 (9th Cir. 1996). As the Supreme Court recently explained, "[t]he natural tendency of regular federal judicial inquiries into state legislative intentions would be to stifle deliberation in state legislatures and encourage resort to secrecy and subterfuge," and "[t]hat would inhibit the sort of open and vigorous legislative debate that our Constitution recognizes as vital to testing ideas and improving laws." *Va. Uranium, Inc. v. Warren*, 139 S. Ct. 1894, 1906 (2019). For example, "federal courts would have to allow depositions of state legislators …, and perhaps hale them into court for cross-examination at trial about their subjective motivations," *id.*, and legislative staff would be subject to producing documents and information related to the legislators' decisions to vote in favor of legislation.

Applying the principle that a plaintiff may not "us[e] a civil action to peer so deeply into the legislative process," *Thillens, Inc. v. Cmty. Currency Exch. Ass'n of Ill., Inc.*, 729 F.2d 1128, 1131 (7th Cir. 1984), courts, including this one, have dismissed RICO actions that require inquiring into legislators' motivations. For example, in *Thillens*, this Court dismissed a RICO claim that "depend[ed] on proof of [legislators'] motives and on a showing of actions taken after bribes were accepted," because such proof would

20

"require investigation into activities cloaked with immunity, including study of staff activities and motivations … toward enacting the challenged laws." *Id.*

Likewise, in *Chappell*, the Ninth Circuit affirmed the dismissal of a RICO case alleging harm from laws allegedly procured by the bribery of a state legislator "because the conduct by which the bribe proximately caused … injury was legislative." 73 F.3d at 921. "Proof [of proximate cause] would … depend on establishing that the legislative acts of writing a bill, voting for it, and persuading others to vote for it, are what harmed plaintiffs. These legislative acts cannot … give rise to liability for damages" because they are immune from scrutiny. *Id.*

Importantly, courts have applied this principle even when the defendant does not itself enjoy legislative immunity. For example, the Second Circuit dismissed a RICO case against two non-immune defendants because proving proximate cause would require discovery into the legislative process and decision-making. *NRP Holdings, LLC v. City of Buffalo*, 916 F.3d 177, 196-97 (2d Cir. 2019). As the Supreme Court has explained, legislative immunity is not meant for the protection of the legislators "for their own benefit, but to support the rights of the people, by enabling their representatives to execute the functions of their office…." *Tenney*, 341 U.S. at 373-74. Allowing the dissection of legislators' motivations, including through discovery directed at them and their staffs, "would inhibit … open and vigorous legislative debate" even if the legislators themselves are not defendants. *Va. Uranium*, 139 S. Ct. at 1906.

State supreme courts, too, have long held that courts may not inspect legislators' motivations. As the Illinois Supreme Court has held, it is a "well-known rule of law that

21

the knowledge and good faith of a Legislature are not open to question and its motives cannot be inquired into," and "[c]ourts must always assume that the legislative discretion has been properly exercised." *Murphy v. Chicago, R.I. & P. Ry. Co.*, 247 Ill. 614, 619 (1910); *see also* 1 *Sutherland Statutory Construction* § 13:17 Westlaw (7th ed.) (collecting cases from numerous states).[10]

Plaintiffs' suit runs afoul of this principle. For example, even if Plaintiffs had properly alleged proximate cause (which, as discussed below, they did not), their conclusory allegations that "Madigan wielded his enormous power and influence to ensure passage through the Illinois legislature," Compl. ¶1, or that Madigan "ensure[d] House members would vote in support" of EIMA, *id.* ¶119, would require invasive inquiry into the mental processes of state legislators. That is exactly "the sort of deconstruction of the governmental process and probing of the official 'intent' that [courts] have consistently sought to avoid." *Columbia*, 499 U.S. at 377-78.

\*     \*     \*

None of this is to say that corruption should go unpunished. ComEd entered into a DPA and paid a $200 million penalty. Nor are customers without a remedy if legislators regret their votes. But the remedy must come from the Illinois General Assembly, not

---

[10] *See also, e.g., City of Little Rock v. Town of N. Little Rock*, 79 S.W. 785, 786 (Ark. 1904) ("[W]e cannot inquire into the motives of the Legislature…. The allegation … that the passage of the act was obtained in a fraudulent and surreptitious manner cannot be considered…."); *Blank v. Kirwan*, 703 P.2d 58, 66 (Cal. 1985) ("'[S]eparation of powers precludes judicial inquiry into the "motivation or mental processes" which may underlie action by a nonjudicial agency of government.' Thus, the official's motives, no matter how self-interested …, cannot vitiate otherwise valid government action." (citations omitted)); *Slack v. Jacob*, 8 W. Va. 612, 636 (1875) ("For the faithfulness and honesty of their public acts, … [state legislators] are responsible to the public alone, and not by means of a trial before the courts.").

through "civil litigation in the courts." *Empress Casino*, 763 F.3d at 731.    Indeed, the General Assembly passed new energy legislation in 2021 with full knowledge of the DPA and it mandated a specific investigation and, depending on the findings, directed specific refunds.    220 ILCS 5/4-604.5(b).    The law also *expanded* FEJA's support for zero-emissions nuclear resources and energy efficiency.    Plaintiffs may wish the legislature had directed a broader investigation and authorized larger potential refunds, or had abandoned FEJA's policy choices, but their dissatisfaction with the legislature's choices does not give them a cause of action in court.

### C. Plaintiffs' Counterarguments Have No Merit.

Plaintiffs argue that they are not "seeking to have the courts strike down or nullify EIMA or FEJA," Br. 26, and assert that "no one here is trying to void any statutes." *Id.* But the fact that they do not and cannot challenge the laws' validity is why their claims must fail.    Plaintiffs are seeking to recover damages for "injury" inflicted by concededly valid laws.    That is precisely the kind of collateral attack that *Fletcher* prohibits.

This Court rejected the same argument Plaintiffs make here in an iteration of the *Empress Casino* litigation.    There, the plaintiffs sought a constructive trust under RICO of amounts received by the horse-track owners under the Illinois statute.    The Court, sitting *en banc*, held that the Tax Injunction Act prohibited such relief.    The dissent argued that the Tax Injunction Act did not apply because the case was a "RICO suit between private parties seeking a private-law remedy," "not a public-law suit against a state or local taxing authority seeking a remedy against the enforcement of a tax statute or otherwise interfering with the collection of state or municipal revenue." *Empress*

*Casino Joliet Corp. v. Balmoral Racing Club, Inc.*, 651 F.3d 722, 735 (7th Cir. 2011) (en banc) (Sykes, J., dissenting).  But the Court rejected that argument.  It explained that, although "the state is not a party to this suit," the relief "would thwart the tax as surely as an injunction against its collection.  The taxpayers (the casinos) are seeking a constructive trust of the tax revenues, which if imposed would result in their recapturing the taxes they have paid. The tax would be nullified." *Id.* at 726.

The same is true here.  As the district court explained, Plaintiffs "are arguing they should be reimbursed for the effect those laws had on the rates they paid for electricity … [and] believe that any amounts defendants were able to collect from plaintiffs (in the form of higher rates for the electricity plaintiffs used) on account of the three laws should be given back to the plaintiffs in the form of damages…." SA-211.  But, as the district court observed, "How … is that different from nullifying those laws?  Plaintiffs are certainly arguing that the rates—that are a product of those State laws—are nullities.… The effect to plaintiffs [of reimbursement for increased rates] is essentially the same as nullifying the State law, all based on the motives of the legislators," which is prohibited by *Fletcher*. *Id.*

Plaintiffs attempt to distinguish *Fletcher* by arguing that the separation of powers doctrine applies only where the parties to the action are innocent third parties.  Br. 25-26.  That limitation is nowhere to be found in *Fletcher*, and it is inconsistent with *Fletcher*'s rationale—as *Empress Casino* shows.[11]  The point of *Fletcher* is that a court

---

[11] *See also*, *e.g.*, *Murphy*, 247 Ill. at 619 (applying separation of powers rule even where defendant was involved in bribery); *McCulloch v. State*, 11 Ind. 424, 436 (1858) (applying separation-of-

must treat a duly enacted law as the public policy of the State, and that allegations of legislative improprieties cannot convert legally authorized actions by private parties into legally cognizable injury.

Moreover, the exception asserted by Plaintiffs would obliterate the principles articulated in *Fletcher*. After all, "[f]ew governmental actions are immune from the charge that they are 'not in the public interest' or in some sense 'corrupt.'" *Columbia*, 499 U.S. at 377. If allegations of legislators' corrupt motives were sufficient to prevent dismissal, courts would find themselves engaged in precisely the kind of invasive scrutiny of the legislative process that the law condemns to determine the truth or falsity of those allegations, all to decide whether the separation of powers bars the claim. That would make little sense.

Plaintiffs also fight with this Court's statement in *Empress Casino* that even if there were "extraordinary" evidence that a "corrupt official … had hijacked [the] foundational institution of state sovereignty," "*the cure may not lie in civil litigation in the courts*." 763 F.3d at 730-31 (emphasis added). Plaintiffs suggest that, by using the words "*may not*" instead of the words "does not," the Court intended to imply that the opposite remained a possibility. Br. 26-27. The Court made clear, however, that by "may not" it meant "cannot"—*i.e.*, that such a suit is barred as a matter of law—by citing to *Fletcher* for the same principle: "'[A] court, sitting as a court of law, *cannot* sustain a suit

---

powers principle where defendants were in "direct complicity" with "the most unblushing and high-handed malpractices").

brought by one individual against another founded on the allegation that the act is a nullity, in consequence of the impure motives which influenced certain members of the legislature which passed the law.'" *Empress Casino*, 763 F.3d at 731 (quoting *Fletcher*, 10 U.S. at 131) (emphasis added).

Plaintiffs also rely on the district court opinion in *Empress Casino*, citing that opinion's distinction between a claim seeking damages and one making a facial challenge. But this is the very distinction that this Court rejected in saying that "the cure may not lie in civil litigation in the courts." 763 F.3d at 731. After all, *Fletcher* itself involved a damages claim, not a facial challenge to a law. The fact that Plaintiffs make such efforts to resist this Court's plain statement in *Empress Casino* just underscores the fatal flaw infecting their claims.

Nor does it matter that *Empress Casino* reached the summary judgment stage. Neither the district court nor this Court considered or addressed a separation of powers argument at the motion to dismiss stage. *See Empress Casino Joliet Corp. v. Blagojevich*, No. 09-cv-3585 (N.D. Ill.), ECF Nos. 33, 44, 47; *Empress Casino Joliet Corp. v. Blagojevich*, 674 F. Supp. 2d 993, 1000-01 (N.D. Ill. 2009), *rev'd*, 638 F.3d 519 (7th Cir. 2011), *vacated in part on reh'g*, 649 F.3d 799 (7th Cir. 2011); *Empress Casino Joliet Corp. v. Blagojevich*, 638 F.3d 519 (7th Cir. 2011), *vacated in part on reh'g*, 649 F.3d 799 (7th Cir. 2011).

Plaintiffs also contend that RICO displaces *Fletcher* because Congress enacted RICO as "a means of rooting out public corruption." *Bieter Co. v. Blomquist*, 987 F.2d

1319, 1320 (8th Cir. 1993).[12]  But civil RICO claims require allegations of "injury to business or property," and that injury must be "legally cognizable." *Taffet v. S. Co.*, 967 F.2d 1483, 1494-95 (11th Cir. 1992) (internal quotation marks omitted).  As discussed above, an injury is not legally cognizable when it arises from an unchallenged, validly enacted law.

Moreover, Plaintiffs' position proves too much.  It is well-settled that other constraints on a court's adjudicative power—such as legislative immunity and the filed rate doctrine—apply to RICO as much as to any other federal cause of action.  *See, e.g.*, *Chappell*, 73 F.3d at 923-24 (holding that RICO did not abrogate common-law legislative immunity); *H.J. Inc. v. Nw. Bell Tel. Co.*, 954 F.2d 485, 488-94 (8th Cir. 1992) (affirming dismissal on basis that filed rate doctrine barred RICO claim alleging telephone company defendant bribed members of the state commission to set higher telephone rates); *Taffet*, 967 F.2d at 1494 (dismissing RICO action because plaintiff "suffered no legally cognizable injury by virtue of paying the filed rate").  There is no reason why the separation of powers should be any different.

The fact that RICO was enacted 160 years after *Fletcher* only confirms that the district court is correct.  As Plaintiffs recognize, "it is to be assumed that Congress was aware of established rules of law applicable to the subject matter of the statute and thus, upon enactment, the statute is to be read in conjunction with the entire existing body of law." *Kansas City v. Fed. Pac. Elec. Co.*, 310 F.2d 271, 275 (8th Cir. 1962) (cited by Appellants, Br. 28) (holding that preexisting common law fraudulent concealment

---

[12] Notably, *Bieter* involved a city council, not a state legislature.

doctrine applied to actions brought under later-enacted Clayton Act).  That inference has particular force when it comes to bedrock separation of powers principles dating back to the Founding.

## II.  Plaintiffs' Complaint Failed to Allege a Direct Relationship Between the Alleged Wrongful Conduct and Their Alleged Injury.

Even putting aside the separation-of-powers principles that categorically bar this suit, the Complaint was still properly dismissed.  As the district court correctly held, Plaintiffs' RICO claim fails as a matter of law because Plaintiffs have not pleaded, and cannot plead, a *direct* relationship between the alleged illegal conduct and their injury as required by the Supreme Court's proximate-cause case law under RICO.

### A. Plaintiffs Failed to Allege Proximate Causation Because Independent, Intervening Causes Break the Causal Chain.

To state a claim under RICO, a plaintiff must allege an injury "by reason of a violation" of the prohibition on racketeering. 18 U.S.C. § 1964(c). This requires a plaintiff to plead a *direct relationship* between the alleged illegal conduct and the harm.  *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006) ("[T]he central question . . . is whether the alleged violation led directly to the plaintiff's injuries."); *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 12 (2010); *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 268-69 (1992).  Mere but-for causation is not enough.  A RICO plaintiff must establish "that the defendant's violation not only was a 'but for' cause of his injury, but was the proximate cause as well." *Holmes*, 503 U.S. at 268.  Nor is it enough that harm is a foreseeable or intended downstream effect. *Hemi Grp.*, 559 U.S. at 12.  Rather, the plaintiff must allege

28

facts establishing that the illegal conduct "led directly to its injuries." *Id.* at 14.  Courts should not reach "beyond the first step." *Holmes*, 503 U.S. at 271-72.

Here, Plaintiffs' theory "requires us to move well beyond the first step" and "is anything but straightforward: Multiple steps . . . separate the alleged [illegality] from the asserted injury," leaving Plaintiffs unable to plead proximate cause. *Hemi Grp.*, 559 U.S. at 10, 15.  Plaintiffs' serpentine causal theory is as follows: ComEd sought to influence the Speaker; that influence led the Speaker to support the legislation; that support made it possible for the legislation to be brought to a vote; that in turn made it possible for the legislation to pass in both houses of the legislature, and then for both houses to vote to override the Governor's veto; that then made it possible for ComEd to propose investments it could legally have made even without the legislation but might not have made; that led the ICC to review those investments, and after finding them to be prudent and reasonable, to allow ComEd to recover the costs in rates; and that, in turn, led to the bills that allegedly injured Plaintiffs.  As to FEJA, the causal chain is similar but contains yet another link: a public procurement process conducted by the IPA, followed by an ICC finding of cost-effectiveness.

To be sure, Plaintiffs allege that the proposed legislation would not have advanced but for improperly procured support from Speaker Madigan.[13]  But even if so, that could still only establish a but-for cause of injury—not proximate causation.  *Compare* Compl.

---

[13] Compl. ¶155 (Madigan "could have killed the bill"); *id.* ¶5 (legislation "never would have been enacted without the active support of Madigan"); *id.* ¶119 ("Absent Madigan's active support . . . EIMA would not have become law."); *id.* ¶182 (FEJA's passage "would never have happened without Madigan").  All of these are allegations of but-for causation.

¶225 ("[N]either EIMA, the EIMA Amendments, nor FEJA would have passed *but for* Madigan's fraudulently-obtained support" (emphasis added)), *with Holmes*, 503 U.S. at 268 (requiring racketeering activity be not only "a 'but for' cause of . . . injury," but also "the proximate cause as well"). Deciding not to block a bill is different than forcing a bill's passage. Madigan's support was separated from the ultimate alleged injury by numerous other causes, all much more proximate to that alleged injury.

### 1. The Independent Decisions of Scores of Legislators.

Most glaringly, the causal chain between the bribery of the Speaker and Plaintiffs' alleged injury is broken by the independent decisions of scores of legislators of both parties, in both the House and Senate, who voted in favor of EIMA and FEJA. The graphics below show the vote counts for the EIMA override vote and FEJA vote:



| EIMA – Second Vote Overriding Governor's Veto | | | | |
|---|---|---|---|---|
| | | Democrats | Republicans | Total |
| House | Yeas | 39 | 35 | 74 |
| | Nays | 24 | 18 | 42 |
| Senate | Yeas | 23 | 13 | 36 |
| | Nays | 10 | 9 | 19 |

| FEJA | | | | |
|---|---|---|---|---|
| | | Democrats | Republicans | Total |
| House | Yeas | 44 | 19 | 63 |
| | Nays | 16 | 22 | 38 |
| Senate | Yeas | 24 | 8 | 32 |
| | Nays | 9 | 9 | 18 |



*FEJA had Governor Support*
**Bruce Rauner (R)**

Plaintiffs argue that proximate cause need not depend on vote-counting, asserting that under *Empress Casino* "all it takes is a plausible allegation that 'one corrupt official … hijacked'" the State legislature.  Br. 23; *id.* at 26-27.  But this Court only accepted that premise "for present purposes," before proceeding to reject the *Empress* plaintiffs' claims regarding the '06 Act for lack of proximate cause.  *Empress Casino*, 763 F.3d at 730.  In any event, even if "hijacking" were the standard, Plaintiffs fail to meet it here, for three reasons.

*First,* as discussed above, the Court is barred from inquiring into the motivations of legislators. Determining whether the Speaker had "hijacked" the State legislature would necessarily require inquiry into whether the other legislators voted at Madigan's behest or for other reasons.  *See supra* at 20-22; *NRP Holdings*, 916 F.3d at 196-97 (legislative decision is "an intervening cause sufficient to break the causal chain.").

*Second,* Plaintiffs fail to plausibly allege that Speaker Madigan "hijacked" the General Assembly. As this Court observed, "[t]he evidence would have to be extraordinary" to conclude that "the workings of an entire state legislature were coopted by the bribery of one official." *Empress Casino*, 763 F.3d at 730.  While ComEd does not

dispute that Madigan had substantial influence and control over fellow lawmakers concerning legislation, Plaintiffs' purportedly "concrete allegations regarding Madigan's unprecedented level of influence and control over the Illinois General Assembly," Br. 21, are insufficient to show that he coopted the entire bipartisan legislative process. They merely establish that Speaker Madigan was, in general, a powerful legislator and that his support was a but-for cause of the passage of EIMA and FEJA. That is not enough. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." (internal quotation marks omitted)).

Indeed, some of Plaintiffs' allegations undercut the plausibility of their hijacking theory. For example, the Complaint alleges that Madigan manipulated a Committee to allow a House Resolution concerning the importance of Illinois's nuclear plants to come to a vote. Compl. ¶180. But the premise for that move, as described by the Complaint, is that the Speaker *lacked control* over six legislators of his own party. Moreover, two dozen Democrats in the House voted against EIMA—hardly what one would expect if Plaintiffs' hijacking theory were correct. And the Complaint makes no well-pleaded allegation concerning Madigan's control over the Senate, a separate legislative chamber.

***Third,*** Plaintiffs' allegations are insufficient to show that any influence Madigan may have exerted over fellow lawmakers was *improper* influence, as would be required to allege proximate cause. When this Court rejected the RICO claim regarding the '06 Act in *Empress Casino*, it did so because there was no evidence that the Governor, though having received a bribe to push the '06 Act through the legislature, exerted

32

"improper influence over state legislators in order to win their support."  763 F.3d at 729.

The Court explained that evidence of "simple logrolling" would not suffice to show

improper influence.  *Id.*

Here, as the district court explained, "Plaintiffs have not alleged that the bribe of

Madigan *caused* the members to vote in favor, because, just as with the '06 Act in

*Empress Casino*, plaintiffs have not plausibly alleged that Madigan *improperly*

influenced the other legislators who voted to pass the bill."  SA-206.  If other legislators

were induced to vote for the bill because of promises for "support for re-election, or a

commitment to co-sponsor a bill, without any taint of bribery, nothing would be wrong."

*Empress Casino*, 763 F.3d at 730.  The other legislators would not have voted for the

legislation "by reason" of a RICO violation.  18 U.S.C. § 1964(c).  The "usual give-and-

take of legislative lawmaking," such as "simple logrolling … falls short of evidence that

could support a RICO claim."  *Empress Casino*, 763 F.3d at 729-30.

### 2.  The Independent Actions of the ICC and the IPA.

Plaintiffs also cannot establish proximate cause because the conduct directly

responsible for the alleged harm was not the passage of the legislation but the

independent actions of the ICC and IPA.  Under EIMA, the ICC was required to, and

did, review ComEd's actual costs and find that they were prudently incurred and

reasonable under the traditional ratemaking standards, before ComEd was authorized to

pass those costs on to customers.  *See supra* at 4-8; 220 ILCS 5/16-108.5(c)(1), (d)(3).  Even

after the DPA, the ICC confirmed its view that ComEd's investments under EIMA were

prudent and reasonable.  2020 Order at 6.  For FEJA, the IPA held a public procurement

for zero emission credits and applied neutral environmental criteria when selecting Exelon's nuclear plants to receive the credits.

Thus, "the conduct directly causing the harm" (the charging of rates) "was distinct from the conduct giving rise to the [RICO claim]" (the attempts to influence the Speaker), *Hemi Grp.*, 559 U.S. at 11, and the alleged illegal conduct was separated from the harm by the independent decisions of others. *See id.* at 15 (rejecting causation where plaintiffs' "theory of liability rests on the independent actions of third and even fourth parties").

## B. Plaintiffs' Remaining Arguments Have No Merit.

Attempting to paper over the numerous independent decisions that lay between the bribery and the ultimate injury, Plaintiffs analogize Defendants' actions to an "arsonist who sets a fire in a stiff wind, hoping the wind will carry the fire" and assert that ordinary principles of tort law will not absolve the arsonist of liability "by raising the independent action of the wind in his defense." Br. 19. But the intervening causes discussed above are hardly analogous to the natural, uncontrollable phenomenon of wind. Indeed, scores of legislators exercised their independent will to vote in favor of passing EIMA and FEJA. "Under our form of government, legislators have a duty to exercise their judgment and to represent their constituents. It is insulting to suggest that they are mere dupes or tools." *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2350 (2021). To contend that legislators' votes are merely "a stiff wind" inappropriately tosses aside the independent will of those legislators who lie at "the heart of the 'Republican Form of Government.'" *Empress Casino*, 763 F.3d at 730 (citation omitted).

Plaintiffs' second fire analogy fares no better. An "arsonist who burns down a cabin the day before a natural forest fire" is liable for injury. Br. 19-20. But in that hypothetical, proximate cause is a given because there is no question that the arsonist burned down the cabin. Here, however, Plaintiffs would need to prove that Madigan's improper influence is what caused the legislation to pass the House and Senate. Plaintiffs make no well-pleaded allegation of such improper influence, and, under the separation of powers, a court cannot make such an inquiry into legislators' motivations in any event. *See supra* at 20-22.

Plaintiffs also argue that proximate causation is established by Plaintiffs' status as the only intended victims. Br. 14-15; Compl. ¶226 (alleging "express aim" of scheme was higher rates). But that argument conflates foreseeability and intent with directness—exactly the argument rejected by the Supreme Court in *Hemi Group*. As the Court explained in that case, the "dissent would have RICO's proximate cause requirement turn on foreseeability, rather than on the existence of a sufficiently 'direct relationship' between the fraud and the harm. It would find that the City has satisfied that requirement because 'the harm is foreseeable; it is a consequence that Hemi intended, indeed desired; and it falls well within the set of risks that Congress sought to prevent.'" 559 U.S. at 12 (quoting Breyer, J., dissenting, 559 U.S. at 24). The Court emphatically rejected that position: "Our precedents make clear that in the RICO context, the focus is on the directness of the relationship between the conduct and the harm" and "never even mention the concept of foreseeability." *Id.*; *see also*, *e.g.*, *Anza*, 547 U.S. at 460 (plaintiff could not "circumvent the proximate-cause requirement simply

35

by claiming that the defendant's aim was to increase market share at a competitor's expense.").

Plaintiffs cite *Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. 639 (2008) (Br. 14-15), but that case is inapposite. In *Bridge*, the defendants employed shadow bidders to exploit the rules of a county tax-lien auction. This resulted directly in the plaintiffs, who comprised other independent bidders, losing out on liens. The Court concluded that the plaintiffs' injury was sufficiently direct because, importantly, "there [were] no independent factors that account for [plaintiffs]' injury." 553 U.S. at 658. The defendants' scheme did not depend on the independent decisions of any other parties—the county awarded liens automatically on a rotational basis purely based on the number of bidders. Here, by contrast, the bribery of Madigan did not automatically result in customers incurring the charges arising from EIMA and FEJA. Multiple "independent factors," including the independent decisions of scores of legislators, the independent actions of the ICC and IPA, and ComEd's independent investment decisions, stand between Defendants' conduct and Plaintiffs' alleged harm. *See supra* at 30-34.

Plaintiffs also argue that the "the burden of proving an intervening cause … is on the defendant." Br. 20 (quotation marks omitted). But the Complaint alleges that a legislative process stood between Madigan's bribery and the bills' passage. For example, it alleges that "[u]nder Madigan's stewardship, the Illinois legislature passed three bills," Compl. ¶4, that Madigan "used his powers and influence … to permit a vote" and "urge[d] support," *id.* ¶119, and that Madigan "successfully pressured" House members. *Id.* ¶162.

36

It is a question of law whether the votes of Illinois legislators—none of whom other than Madigan are alleged to have been bribed—constitute an intervening cause.

Plaintiffs cite *Bieter* in an attempt to argue for an expansive "view of causation in group decisionmaking" cases, Br. 23, but *Bieter* is inapposite. It involved a small city council comprised of a handful of councilmembers—not a state legislature with dozens of members in two separate houses. Allegations that one individual could improperly influence two other members of a small city council are inherently more plausible than an individual improperly influencing dozens of members of a state legislature. (And a city council is not a "foundational institution of state sovereignty," *Empress Casino*, 763 F.3d at 730-31). In addition, *Bieter* did not involve the further intervening causes of independent actions by third parties after passage of the relevant laws (here, ComEd's investment decisions, and the ICC's and IPA's actions).

Plaintiffs cite *Waste Management of Louisiana L.L.C. v. River Birch, Inc.*, 920 F.3d 958 (5th Cir. 2019) (Br. 24), but that case is plainly irrelevant. It involved the alleged bribery of a mayor who took *executive* action that allegedly injured the plaintiffs. The line of causation in that case was direct, as it involved only the decisionmaking of the mayor, who was bribed—just like the '08 Act in *Empress Casino*, which involved the bribery of the Governor to sign legislation that already had been passed.

Finally, Plaintiffs cite *Smith v. FirstEnergy Corp.*, 518 F. Supp. 3d 1118 (S.D. Ohio 2021) (Br. 24-25).[14] But even *Smith* acknowledged the possibility that "the only form of

---

[14] No separation of powers argument was made in *Smith*; moreover, prior to the court's ruling on the motion to dismiss, the Ohio Attorney General obtained a state-court injunction against the statute. Motion by Plaintiff State of Ohio for Temporary Restraining Order & Preliminary

evidence that would permit Plaintiffs['] claims to go to trial" could "involve the type of evidence that may be forbidden by legislative immunity," recognizing that proximate causation in that circumstance would fail. *Id.* at 1136. *Smith* otherwise is an unpersuasive out-of-circuit district court opinion that misapplied the law.

## III. The Filed Rate Doctrine Compels Dismissal With Prejudice.

The filed rate doctrine independently requires dismissal with prejudice. It bars claims for damages where the alleged harm stems from paying electric rates authorized by a tariff. *See Arsberry v. Illinois*, 244 F.3d 558, 562 (7th Cir. 2001) (citing *Wegoland Ltd. v. NYNEX Corp.*, 27 F.3d 17, 19-21 (2d Cir. 1994)). The district court acknowledged that the filed rate doctrine "would appear to be a slam dunk" in this case, but nevertheless declined to reach the issue on the ground that is an affirmative defense. However, Plaintiffs' Complaint pleads into the defense, and thus it properly can be considered on a motion to dismiss. Accordingly, this Court can affirm based on the filed rate doctrine as well as on the grounds reached by the district court. *See*, *e.g.*, *Cont'l Ins. Co. v. M/V ORSULA*, 354 F.3d 603, 606 (7th Cir. 2003) (The Court "may affirm a district court's judgment on alternate grounds found in the record.").

### A. The Filed Rate Doctrine Was Properly Before the District Court.

As the district court understood, the crux of Plaintiffs' case is that they were injured by paying rates that were "excessive and unwarranted" as a result of EIMA and

---

Injunction, *Ohio v. FirstEnergy*, Case No. 20-CV-6281 (Ohio Ct. Common Pleas, Franklin Cnty. Jan. 13, 2021), https://www.ohioattorneygeneral.gov/Files/Briefing-Room/News-Releases/2021-01-13-YOST-PI-Motion-for-FirstEnergy-Decoupli.aspx; *Smith v. FirstEnergy Corp.*, 518 F. Supp. 3d at 1126.

FEJA. Compl. ¶1. Plaintiffs complain that EIMA and FEJA permitted "ComEd to charge higher electric rates, impose new fees, and collect increased profits," *id.*, and allege that as a result of these statutes "ComEd distribution rate revenues have grown by hundreds of millions of dollars since 2014." *Id.* ¶186.

The district court nevertheless held it could not reach the filed rate doctrine because the Complaint did not literally plead that "the rates plaintiffs paid for the electricity they used were filed." SA-201. That is an overly formalistic view of Rule 12(b)(6). Courts may dismiss a complaint based on an affirmative defense when a complaint "set[s] forth everything necessary to satisfy the affirmative defense." *United States v. Lewis*, 411 F.3d 838, 842 (7th Cir. 2005). And courts may consider not only "the complaint itself," but also "documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice." *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012) (collecting cases); *Menominee Indian Tribe of Wis. v. Thompson*, 161 F.3d 449, 456 (7th Cir. 1998); *Schafer v. Exelon Corp.*, 619 F. Supp. 2d 507, 512-13 (N.D. Ill. 2007) ("On a motion to dismiss, this court can take judicial notice of the rates on file with, and the publications of . . . the [ICC]").[15] Otherwise, plaintiffs could artfully plead around obvious "slam dunk" defenses at the dismissal stage, and waste the resources of the parties and the Court alike.

---

[15] Moreover, even if the district court were correct for purposes of Rule 12(b)(6), it could have construed that portion of the motion to dismiss as a motion brought under Rule 12(c). *See Gunn v. Cont'l Cas. Co.*, 968 F.3d 802, 807 (7th Cir. 2020).

Here, the Complaint invoked both EIMA and FEJA, and made allegations about the regulatory process through which rates under EIMA and FEJA were authorized. *E.g.*, Compl. ¶¶1, 6, 85, 153, 169-70, 173, 176. Those statutes, as well as judicially noticeable materials regarding that regulatory process—such as the ICC orders implementing EIMA and FEJA and the tariffs themselves, all of which Defendants cited, ECF No. 85 at 9 & n.7—are fairly within the Complaint's scope.

EIMA makes clear on its face that the rates charged under the statute stem from a "formula rate tariff" that the utility "files" with the ICC. 220 ILCS 5/16-108.5(b)(1). The statute states, for example, "The performance-based formula rate shall be *implemented through a tariff filed with the [ICC]* … that shall be applicable to all delivery services customers." *Id.* 16-108.5(c) (emphasis added). The statute then directs that "*the utility shall file*, on or before May 1 of each year, with the Chief Clerk of the [ICC] its updated cost inputs to the performance-based formula rate for the applicable rate year and the corresponding new charges." *Id.* 16-108.5(d) (emphasis added). As Defendants pointed out in their motion to dismiss, as part of the rate-setting process described by Plaintiffs in their Complaint, and following the ICC's review of ComEd's cost submissions, the ICC "directed ComEd *to file*, each year, *updated rates in strict compliance*" with the ICC's orders. ECF No. 85 at 9. ComEd cited all of the orders in which the ICC had so directed, *id.* at 9 n.7, and the filings that ComEd made in response. *Id.*

FEJA, too, provides that utilities are entitled to recover costs associated with zero emission credits and energy efficiency programs "through an automatic adjustment

clause tariff." 20 ILCS 3855/1-75(d-5)(6); 220 ILCS 5/8-103B(d)(1).  Consistent with that statute, the ICC approved a tariff allowing ComEd to recover the costs from customers in its rates.  Defendants cited the transmittals that filed these tariffs with the ICC, which are a matter of public record.  ECF No. 85 at 12 & n.15.

Indeed, as a regulated utility, ComEd is not permitted to charge its distribution customers anything other than rates filed with the ICC.  *See* 220 ILCS 5/9-102 (public utility "shall file with the [ICC] … all rates and other charges … for any service performed by it"); *id.* § 9-104 (public utility may not "perform any service … unless or until the rates … applicable to such service … have been filed").

Thus, the materials encompassed by Plaintiffs' Complaint establish on their face that the rates and charges paid by Plaintiffs, which form the basis of their Complaint, were all filed with the ICC.  Plaintiffs, notably, have never denied this—nor could they do so.  Moreover, courts routinely consider the filed rate doctrine at the motion-to-dismiss stage.  *See, e.g., Goldwasser v. Ameritech Corp.*, 222 F.3d 390, 402 (7th Cir. 2000); *H.J. Inc.*, 954 F.2d at 495-96 (8th Cir. 1992); *Cnty. of Stanislaus v. Pac. Gas & Elec. Co.*, 114 F.3d 858, 867 (9th Cir. 1997); *Tex. Com. Energy v. TXU Energy, Inc.*, 413 F.3d 503, 510 (5th Cir. 2005).

## B.  The Filed Rate Doctrine Bars the Complaint.

The district court was correct that the filed rate doctrine is a "slam dunk" in this case, and it independently requires affirmance.  Plaintiffs allege that the rates they paid were "excessive and unwarranted" as a result of legislation that was "fraudulently obtained."  Compl. ¶¶ 1, 225.  And they seek damages constituting repayment of the rates

they were charged.  That is exactly the kind of suit that the filed rate doctrine prohibits. Once a "rate is filed with the appropriate regulatory body," a court has "no ability to effectively reduce it by awarding damages for an alleged overcharge[.]"  *Leo v. Nationstar Mortg. LLC*, 964 F.3d 213, 218 (3d Cir. 2020).

A primary rationale for the filed rate doctrine is the "historical antipathy to rate setting by courts, deemed a task they are inherently unsuited to perform competently." *Arsberry*, 244 F.3d at 562.  A customer "cannot ask the court," except on administrative review, "to invalidate or modify the tariff. Nor can it seek damages based on the difference between the actual tariff and a hypothetical lawful tariff.  That would require the court to determine the lawful tariff, and this is not regarded as a proper judicial function."  *Id.*  Calculating damages would improperly "enmesh the courts in the rate-making process." *Wegoland Ltd. v. NYNEX Corp.*, 27 F.3d 17, 19 (2d Cir. 1994).  As this Court has explained, calculating damages arising from a filed rate "is an impossibly speculative task…. It is impossible for this or any court to conclude with any reasonable certainty what [the regulator] would have found to be" an appropriate alternative rate. *In re Wheat Rail Freight Rate Antitrust Litig.*, 759 F.2d 1305, 1313-14 (7th Cir. 1985). Thus, a court may not engage in the task at all.

Accordingly, courts have uniformly applied the filed rate doctrine to dismiss all manner of claims that attack filed rates as excessive and would require courts, in calculating damages, to determine what a reasonable rate would have been—including RICO claims alleging that rates charged under state law were procured by bribery or fraud.

42

For example, in *H.J.*, the Eighth Circuit affirmed dismissal of a RICO claim alleging that a telephone company defendant bribed members of the state commission to set higher telephone rates. *See* 954 F.2d at 486. The court reasoned that "RICO damages can only be measured by comparing the difference between the rates the Commission originally approved and the rates the Commission should have approved absent the conduct of which the class complains." *Id.* at 494. But that called for the court "to engage in ratemaking activities," *id.*, which the filed rate doctrine does not permit.

Similarly, the Eleventh Circuit affirmed dismissal of a RICO claim brought by plaintiffs complaining that a utility's fraudulent misrepresentations to the state commission resulted in inflated rates. To "establish that the rates set by the PSC were in fact unreasonable," the court explained, "the trial judge, or a jury, would have to determine what rate should have been set by the PSC." *Taffet*, 967 F.2d at 1491. The Eleventh Circuit concluded that dismissal was appropriate because that determination would improperly displace the ratemaking scheme. *Id.* at 1490.

In *Wegoland*, the Second Circuit affirmed dismissal of a RICO claim premised on a utility's fraud on the state commission, explaining that a court could determine damages "only by determining what would be a reasonable rate absent the fraud"—"[a]nd it is this judicial determination of a reasonable rate that the filed rate doctrine forbids." 27 F.3d at 21. And in *Leo*, the Third Circuit affirmed dismissal of a RICO claim alleging excessive rates due to fraud on the regulator arising from kickbacks. 964 F.3d at 215. The court explained, "calculating damages would require determining how much we think they should have been charged"—"a new, lower-than-filed-rate price tethered only to our

43

conception of an appropriate kickback-free rate." *Id.* at 217. Yet the filed-rate doctrine

"'preserv[es] the exclusive role of … agencies in approving rates … by keeping courts out

of the rate-making process.'" *Id.* (quoting *In re N.J. Title Ins. Litig.*, 683 F.3d 451, 455

(3d Cir. 2012)). Numerous other cases have applied the doctrine to dismiss similar

claims.[16] In sum, "[t]he filed rate doctrine's fortification against direct attack is

impenetrable." *Wah Chang v. Duke Energy Trading & Mktg., LLC*, 507 F.3d 1222, 1225

(9th Cir. 2007).

These precedents apply with full force here. Plaintiffs' alleged injuries are the

filed rates they paid. Those rates, in turn, paid for tangible investments made by ComEd

that benefited customers: new storm-resistant distribution infrastructure, cybersecurity,

smart meters and advanced metering infrastructure. They also paid for the continued

operation of nuclear power plants that reduced pollution. Plaintiffs do not and could not

---

[16] *E.g.*, *Square D Co. v. Niagara Frontier Tariff Bureau, Inc.* 476 U.S. 409, 424 (1986) (filed rate doctrine barred claim that motor carriers colluded to set artificially high filed rate); *Goldwasser*, 222 F.3d at 402 (filed rate doctrine barred claim seeking damages for overcharges alleged to result from illegal monopolistic and exclusionary practices by telecommunications provider); *Nat. Gas Pipeline Co. v. Fed. Power Comm'n*, 141 F.2d 27, 29 (7th Cir. 1944) (refusing request to determine "excess collections" because doing so would "usurp the functions of the Illinois Commerce Commission"; "this court has not rate-making powers"); *Green v. Peoples Energy Corp.*, No. 02 C 4117, 2003 WL 1712566, at *2-3 (N.D. Ill. Mar. 28, 2003) (filed rate doctrine barred antitrust claim based on state-regulated rates); *Sun City Taxpayers' Ass'n v. Citizens Utils. Co.*, 45 F.3d 58, 62 (2d Cir. 1995) (filed rate doctrine barred damage action by consumer group against carrier despite carrier's fraud during rate-making process); *Marcus v. AT&T Corp.*, 138 F.3d 46, 60-61 (2d Cir. 1998) (same); *Rothstein v. Balboa Ins. Co.*, 794 F.3d 256, 259 (2d Cir. 2015) (filed rate doctrine barred RICO claim that state-regulated rates were fraudulently inflated due to secret kickbacks given to affiliate); *In re N.J. Title*, 683 F.3d 451, 457 (3d Cir. 2012) (filed rate doctrine barred antitrust claims concerning state-regulated title insurance, because court would need "to determine the reasonable rate absent the alleged conspiracy"); *Coll v. First Am. Title Ins. Co.*, 642 F.3d 876, 886–90 (10th Cir. 2011) (filed rate doctrine barred state-law claims arising from allegations that title insurer had bribed state official to set excessive rates); *Patel v. Specialized Loan Servicing, LLC*, 904 F.3d 1314, 1326–27 (11th Cir. 2018) (filed rate doctrine barred RICO claims arising from fraudulent conduct where, in essence, plaintiffs challenged a filed rate).

deny that these investments were actually made.  Perhaps they think they should have paid less, or that some of these investments should not have been made.  But the Court cannot consider such arguments.  Otherwise, in awarding damages, the Court would necessarily need to place itself in the shoes of a hypothetical rate-setter and decide what costs would likely have been incurred and should have been incurred, under a counterfactual state energy policy of Plaintiffs' invention.  That is exactly what the filed rate doctrine forbids.

### C.  Plaintiffs' Contrary Arguments Are Without Merit.

Below, Plaintiffs made several arguments regarding why the filed rate doctrine should not apply to the facts here.  All are without merit.

*First,* Plaintiffs contended below that the state filed rate doctrine should govern, not the federal filed rate doctrine.  Plaintiffs are wrong, but regardless, the outcome would be the same.  The filed rate doctrine is a judicial doctrine governing the power of courts to provide relief.  When the court is applying substantive federal law—as it does when resolving a claim arising under federal law, such as RICO—it applies the federal filed rate doctrine, originating with the Supreme Court's decision in *Keogh v. Chicago & Northwestern Railway Co.*, 260 U.S. 156, 163-65 (1922).  Federal courts of appeals have repeatedly applied *Keogh* and its progeny to causes of action arising under federal law, regardless whether they involve a collateral attack on federal or state-determined rates.[17]

---

[17] *Goldwasser*, 222 F.3d at 402 (filed rate doctrine barred claim seeking damages for overcharges alleged to result from illegal monopolistic practices by telecommunications provider); *Green*, 2003 WL 1712566, at *2-3 (filed rate doctrine barred antitrust claim based on state-regulated rates); *Sun City Taxpayers' Ass'n*, 45 F.3d at 62 (filed rate doctrine barred damages action despite utility's fraud during rate-making process); *Rothstein*, 794 F.3d at 259 (filed rate doctrine barred

These cases do not turn on or even analyze the scope of the filed rate doctrine under state law.  Plaintiffs cited *Gunn v. Continental Casualty Co.*, 968 F.3d 802, 807 (7th Cir. 2020), but there the cause of action arose under state law, and the court, sitting in diversity, needed to decide which substantive state law governed.  RICO arises under federal law.

In any event, the Illinois filed rate doctrine equally requires dismissal.  For example, in *State ex rel. Pusateri v. Peoples Gas Light & Coke Co.*, 2014 IL 116844, the Illinois Supreme Court held that the circuit court had no jurisdiction to hear a claim that a utility, through fraud, had induced customers to pay excessive rates for natural gas.  It explained: "Though the remedy Pusateri seeks is a mix of penalty and damages, the sole reason the alleged falsehoods might be actionable … is that they would have induced [customers, including the State] to pay too much for [the utility's] natural gas…. [That] complaint is one for reparations … subject to the exclusive, original jurisdiction of the [ICC]."  *Id.* ¶19.  The same is true here: the sole reason why ComEd's conduct might be actionable under RICO is that it resulted in customers paying what Plaintiffs describe as "excessive and unwarranted rates."  Compl. ¶1.  Other Illinois cases are in accord.  *See,*

---

RICO claim that state-regulated rates were fraudulently inflated due to secret kickbacks given to affiliate); *N.J. Title*, 683 F.3d at 457 (filed rate doctrine barred antitrust claims concerning state-regulated title insurance, because the court would need "to determine the reasonable rate absent the alleged conspiracy"); *Patel, LLC*, 904 F.3d at 1326–27 (filed rate doctrine barred RICO claims arising from fraudulent conduct); *Taffet*, 967 F.2d at 1494 (federal filed rate doctrine "applies with equal force to preclude recovery under RICO whether the rate at issue has been set by a state rate-making authority or a federal one");  *H.J.*, 954 F.2d at 494 (applying federal rate doctrine to rate approved by state agency).

*e.g.*, *Sheffler v. Commonwealth Edison Co.*, 2011 IL 110166; *Hawkins v. Commonwealth Edison Co.*, 2015 IL App (1st) 133678.[18]

**Second,** Plaintiffs argued below that they are suing over bribery, which has "nothing to do" with or is "incidental" to filed rates. ECF No. 94 at 11, 16. But as their Complaint makes evident, their case has everything to do with filed rates: they allege they were damaged by that bribery only to the extent that it led to the enactment of laws that in turn authorized increases in the filed rates that they paid. Further, measuring their alleged damages would require the Court to "reconstitut[e] the whole rate structure" of the industry, which the court may not do. *Keogh*, 260 U.S. at 164. Accordingly, faced with similar claims and similar arguments, other courts have applied the filed rate doctrine to bar the claim. *E.g.*, *H.J.*, 954 F.2d at 486, 489 (rejecting RICO claim alleging filed rate infected by bribery); *Leo*, 964 F.3d at 215 (rejecting RICO claim alleging filed rate infected by corruption); *Wegoland*, 27 F.3d at 18 (same); *Taffet*, 967 F.2d at 1485-86 (fraud).

**Third,** Plaintiffs argued below that the filed rate doctrine should not apply because the ICC had no choice but to approve the rates ComEd filed. As discussed above, this is false—EIMA preserved the ICC's role to review and approve rates—but regardless, it would be irrelevant even if true. "[S]tate legislatures are competent bodies to set utility rates." *Duquesne Light Co. v. Barasch*, 488 U.S. 299, 313 (1989). State commissions like the ICC are creations of the legislature that exercise the legislature's delegated

---

[18] The Cook County Circuit Court rejected the filed rate doctrine in the parallel state action before dismissing that case on separation-of-powers grounds. The case is now on appeal. Respectfully, Defendants submit that the Circuit Court erred in its filed rate analysis.

authority.  Accordingly, "[i]t is the *filing* of the tariffs, and not any affirmative approval or scrutiny by the agency, that triggers the filed rate doctrine." *Town of Norwood v. New England Power Co.*, 202 F.3d 408, 419 (1st Cir. 2000) (emphasis in original); *Square D Co. v. Niagara Frontier Tariff Bureau, Inc.*, 476 U.S. 409, 417 n.19 (1986) (filed rate doctrine applies "whenever tariffs have been filed," not only where "rates had been investigated and approved" by the agency).  Accordingly, this Court has applied the doctrine despite allegations that the agency was only "nominally" involved in rate-setting, "rarely exercise[d] [its] muscle," and "g[a]ve no meaningful review to the rate structure." *Goldwasser*, 222 F.3d at 402.[19]

**Fourth**, Plaintiffs argued that they are not attacking the rate, but instead just seeking damages from rates they paid.  "That's your classic distinction without a difference." *Metro E. Ctr. for Conditioning & Health v. Qwest Commc'ns Int'l, Inc.*, 294 F.3d 924, 930 (7th Cir. 2002).  If that position were the law, *H.J.*, *Taffet*, and numerous other filed rate cases discussed above would have been decided differently.  But the filed rate doctrine applied in those cases, because treating rates as damages that must be repaid "would invade the province of the agency just as surely as any declaration that [the rate] is 'invalid.'" *Id.*[20]

---

[19] Below, Plaintiffs cited *Smith*, but that case likewise holds that "[i]t is the *filing* of tariffs" that triggers the filed rate doctrine.  518 F. Supp. 3d at 1128.  There, however, the court held that "Defendants did not file the rates." *Id.*  Here, by contrast, the rates were filed, as discussed above.

[20] Plaintiffs also cited *Williams v. Duke Energy International, Inc.*, 681 F.3d 788, 797 (6th Cir. 2012), but that case concerned unauthorized rebates to the plaintiffs' competitors, which violated the filed rate.

*Finally,* Plaintiffs argued below that because the ICC could not remedy their claims, a federal court must be able to do so. But the filed rate doctrine limits the appropriate exercise of judicial power; whether an administrative body can hear a claim does not affect a court's ability to do so. *See Mont.-Dakota Utils. Co. v. Nw. Pub. Serv. Co.*, 341 U.S. 246. 254-55 (1951) (dismissing complaint, notwithstanding the possibility that the rates had been procured by fraudulent means, even though plaintiff had no remedy at the Federal Power Commission); *Nantahala Power & Light Co. v. Thornburg*, 476 U.S. 953, 962-63 (1986) (identifying *Montana-Dakota Utilities* as a filed-rate case). Regardless of what remedial authority has been delegated by the legislature to the ICC, the court may not provide a damages remedy that would require determining what the proper rate should have been. *Arsberry*, 244 F.3d at 562.

Any remedy lies with the legislature, the ultimate rate-setter, which is free to change the law. *See, e.g., Pub. Advoc. v. Phila. Gas Comm'n*, 674 A.2d 1056, 1063 (Pa. 1996) ("If City residents desire a change in [the utility's] rate making method, they can either pressure [the legislative body] to amend the [law] or have their voices heard through the election process."). And here, the legislature did in fact act, even if not to the extent Plaintiffs would have liked.

## CONCLUSION

For the foregoing reasons, this Court should affirm the dismissal of Plaintiffs' Complaint with prejudice.

49

Dated: March 7, 2022

Respectfully submitted,

Commonwealth Edison Company and
Exelon Corporation

By: */s/ Matthew E. Price*

Matthew E. Price
JENNER & BLOCK LLP
1099 New York Ave. NW Suite 900
Washington, DC 20001
(202) 639-6873
mprice@jenner.com

Terrence J. Truax
Nicole A. Allen
Ali I. Alsarraf
JENNER & BLOCK LLP (#05003)
353 N. Clark Street
Chicago, IL  60654-3456
(312) 222-9350
ttruax@jenner.com
nallen@jenner.com
aalsarraf@jenner.com

*Counsel for Defendants-Appellees*

**CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(a)**

1.   This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Circuit Rule 32(c) because, according to the word count function of Microsoft Office 365 (and including the words in the images on pages 30-31), this brief contains 13,990 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.   This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and Circuit Rule 32 and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office 365 in 12 point Century Expanded LT Std font for the main text and 11 point Century Expanded LT Std font for footnotes.

Dated: March 7, 2022

/s/ Matthew E. Price
Matthew E. Price

## CERTIFICATE OF SERVICE

I hereby certify that on the March 7, 2022, I caused the foregoing **Brief of Defendants-Appellees'** to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit using the CM/ECF system.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ Matthew E. Price*
Matthew E. Price